*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MONA EVANS,

　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

UNUMPROVIDENT CORPORATION,

　　　　　　　*Defendant-Appellant.*

No. 05-5154

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 04-00052—Thomas G. Hull, District Judge.

Argued: December 1, 2005

Decided and Filed: January 20, 2006

Before: SILER and GRIFFIN, Circuit Judges; KATZ, District Judge.[*]

---

## COUNSEL

**ARGUED:** Tony R. Dalton, WOOLF, McCLANE, BRIGHT, ALLEN & CARPENTER, Knoxville, Tennessee, for Appellant. Charlton R. DeVault, Jr., Kingsport, Tennessee, for Appellee. **ON BRIEF:** Tony R. Dalton, WOOLF, McCLANE, BRIGHT, ALLEN & CARPENTER, Knoxville, Tennessee, for Appellant. Charlton R. DeVault, Jr., Kingsport, Tennessee, for Appellee.

---

## OPINION

---

GRIFFIN, Circuit Judge. In this action under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, plaintiff Mona Evans claims that her long-term disability ("LTD") benefits were wrongfully terminated by defendant UnumProvident Corporation ("UnumProvident"). The parties filed cross-motions for judgment on the administrative record. Determining that defendant's decision to terminate plaintiff's LTD benefits was arbitrary and capricious, the district court granted plaintiff's motion for judgment on the administrative record and denied defendant's motion. The district court ordered defendant to reinstate plaintiff as a participant and beneficiary under its LTD and life insurance policies and to pay to her past due benefits, plus accrued interest. The district court also awarded plaintiff reasonable attorney fees. UnumProvident's timely appeal followed. We affirm.

---

[*] The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

I.

The present case arises from a complaint originally filed by plaintiff on February 13, 2004, in the district court against her employer, Sunbridge HealthCare, Inc. ("Sunbridge"),[1] and her long-term disability insurer, defendant UnumProvident,[2] seeking damages resulting from the termination of her LTD benefits and reinstatement of those benefits.

The policy defines disability, with regard to the class of employees that includes plaintiff, as follows:

> You are disabled when UNUM determines that:
>
> you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury; and
>
> during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.

The LTD policy further states that disability benefits will cease upon the occurrence of certain events, including "when you are able to work in your regular occupation on a part-time basis but choose not to . . . ." Finally, certain disabilities have a limited pay period under the policy. For example, "[d]isabilities, due to sickness or injury, which are primarily based on self-reported systems, and disabilities due to mental illness have a limited pay period up to 12 months."

II.

Plaintiff is a forty-two-year-old single mother who suffers from complex intractable seizures, a form of epilepsy. According to her affidavit filed in conjunction with the administrative appeal, plaintiff worked as a nursing home administrator at various facilities in Alabama and Tennessee before beginning her work in 1996 with Sunbridge in Greeneville, Tennessee, as a nursing home administrator. As the senior administrator, plaintiff traveled between three nursing homes in Greeneville and Kingsport on a daily basis in order to oversee their operations. Her managerial and administrative duties included top-level decision-making on resident care, financial, budgetary, and personnel issues.

In 1994, plaintiff's family began noticing that she exhibited periods of unresponsiveness and, in January 1995, she suffered a *grand mal* seizure. In August 1995, Dr. John Dengler, a neurologist, diagnosed plaintiff as suffering from complex partial epilepsy and began medicating her. The seizure medication was ineffective, however, and plaintiff's condition deteriorated. Her seizure episodes began interfering with her work for Sunbridge. Plaintiff's seizures became more frequent, typically lasting three to five minutes, and unexpectedly occurred during and after work. Plaintiff suffered seizures during staff meetings and employee conferences, and a particularly severe seizure during an awards ceremony presentation required that plaintiff recuperate at home for more than two

---

[1] Plaintiff ultimately dismissed her claims against Sunbridge, previously known as Sun Healthcare Group, Inc., in April 2004.

[2] Unum Life Insurance Company of America ("UNUM"), a subsidiary of defendant, issued a group LTD policy to Sunbridge and its subsidiaries, for the benefit of their eligible employees, including plaintiff. Defendant provides administrative services for UNUM with regard to claims for benefits under certain policies issued by UNUM, including the policy in this case. Thus, defendant both funds and administers the LTD policy at issue.

days. From February 1997 forward, plaintiff relied on friends, employees, and family to drive her back and forth to the nursing homes each workday. Even as a passenger, she continued to suffer seizures during her commute.

Dr. Dengler referred plaintiff to Dr. Bassel Abou-Khalil, a Vanderbilt University Medical Center neurologist and director of the University's Epilepsy Laboratory. In February 1999, Dr. Abou-Khalil hospitalized plaintiff and monitored her for seizure activities. A total of six seizures were recorded by video and electroencephalograph ("EEG") during the three-day hospitalization. Plaintiff was diagnosed as suffering from partial epilepsy with the epileptogenic focus in the left anterior-basal temporal region of her brain. Surgery was not considered to be an option.

Despite new medications, plaintiff's seizures continued to increase in number and severity. Plaintiff suffered on-the-job seizures that were debilitating. After each seizure, she was unable to remember what had happened in the recent past and could not recall what she had to do in the near future. By June 1999, Dr. Dengler and Dr. Abou-Khalil advised plaintiff that she should take an extended medical leave of absence. Both physicians opined that the stress associated with her administrative duties was responsible for the severity and frequency of the seizure episodes. Plaintiff applied for and received short-term disability benefits from September 1999 through February 2000. She then applied for LTD benefits under the group LTD policy provided by Sunbridge.

In support of her claim for benefits, plaintiff submitted attending physician statements from Dr. Dengler and Dr. Abou-Khalil and the neuro-diagnostic report from Dr. Abou-Khalil based on his three-day hospitalization study. Dr. Dengler opined that plaintiff was unable to drive or work in stressful situations and that her prognosis for recovery was "fair." Dr. Abou-Khalil indicated that plaintiff had frequent seizures with altered awareness which impaired her ability to work. He restricted plaintiff from activities such as using the stove or oven, driving, and operating heavy machinery. Dr. Abou-Khalil opined that plaintiff had not reached maximum medical improvement and that he expected it to be more than six months before there would be any fundamental changes in her medical condition.

Defendant determined that plaintiff met the definition of disability under the LTD policy and approved her receipt of benefits from March 2000 through May 2003. Because plaintiff's employee welfare benefit plan also provided a waiver of her group life insurance premium if she was disabled, she also received defendant's life insurance benefit with a waiver of premium guarantee. Plaintiff was awarded, and continues to draw, social security disability benefits.

Defendant thereafter continued to monitor plaintiff's medical condition with periodic updates. The following information was collected as part of defendant's monitoring process and is included in the administrative record considered by the district court.

An office note dated October 31, 2000, from Dr. Abou-Khalil indicated that plaintiff had not suffered any complex partial seizures since her last visit on July 31, 2000, although she still experienced auras (indications of the onset of a seizure) and difficulty with her memory. An examination revealed that she had no nystagmus, no tremor, no dysmetria, and no ataxia. Dr. Abou-Khalil was pleased with her seizure control.

A form completed by Dr. Abou-Khalil on January 4, 2001, indicated that plaintiff should not work in any situation where seizures could cause harm to herself or others, and she should not drive, handle hot items, operate moving machinery, or be in high, unprotected places. In an office note dated April 23, 2001, Dr. Abou-Khalil reported that plaintiff had not experienced any seizures since her visit in October 2000, and, in light of her excellent seizure control, he would not need to see her again for a year.

On April 20, 2001, defendant's disability consultant, Rick Yi, recommended that defendant conduct a vocational review and obtain further information from Dr. Abou-Khalil regarding his restrictions and how they would apply to plaintiff's occupation. On May 4, 2001, Lilia Rascon, a certified rehabilitation consultant, reviewed plaintiff's file and determined that her light duty occupation as an administrator of a health care facility fit well within Dr. Abou-Khalil's restrictions; thus, according to Ms. Rascon, plaintiff should be able to perform the material requirements of her position.

On August 8, 2001, defendant sent a letter to Dr. Abou-Khalil advising him that it believed plaintiff could perform her occupation within the restrictions and limitations he had provided. Dr. Abou-Khalil was asked whether or not he agreed with this assessment. He responded as follows:

> Increased levels of stress can be a precipitant to seizure activity. Since Ms. Evans has been away from her work environment, the seizures have improved tremendously. The position of Nursing Home Administrator requires an enormous amount of responsibility along with very important decision-making skills. The stress level is very high. During and after a seizure, Ms. Evans is unaware of her surroundings, and is unable to make any rational decisions. It would be in Ms. Evans['] best interest not to return to work at this time.

On August 24, 2001, at a roundtable discussion of plaintiff's case, Dr. Michael Randall, a staff physician for defendant, who is board-certified in preventive medicine with a sub-specialty in occupational and environmental medicine, concluded that it was unreasonable to speculate that plaintiff's return to work would exacerbate her condition.

On September 6, 2001, defendant had Dr. Randall review plaintiff's medical records. He concluded that plaintiff's medical records did not support Dr. Abou-Khalil's opinion that her seizures were likely to be induced by workplace stress. Dr. Randall believed that Dr. Abou-Khalil was exaggerating the evidence to keep plaintiff totally disabled and further opined that Dr. Abou-Khalil's comment regarding stress as a precipitant was clearly "prophylactic" and without documentation to support it. Dr. Randall concluded that plaintiff's current medications adequately controlled her condition, and, in his judgment, she could return to her regular occupation with reasonable restrictions and limitations as stated by Dr.Abou-Khalil in January 2001.

In an office visit to Dr. Abou-Khalil on September 24, 2001, plaintiff reported experiencing ten auras and estimated that she had experienced ten complex partial seizures. She also thought she might be having additional seizures while asleep. Dr. Abou-Khalil adjusted the dosage of her medication and again referenced stress as a probable factor causing the seizures. Following an office visit on October 12, 2001, his impression was "recurrent seizures, perhaps brought on by stress."

On March 18, 2002, defendant had plaintiff's records reviewed by Dr. Lance J. Lee, a staff neurological consultant board-certified in psychiatry and neurology. Dr. Lee agreed with Dr. Randall that the stress avoidance restriction was prophylactic but agreed with Dr. Abou-Khalil's other prescribed restrictions and limitations.

On March 25, 2002, plaintiff had an office visit with Dr. Abou-Khalil and reported that she had experienced six seizures that month. He again adjusted her medication. Then, on her September 23, 2002, visit, Dr. Abou-Khalil indicated that her seizures were apparently completely controlled, but that in the past month, plaintiff had been under increased stress and had been waking up in the morning with a postictal feeling, indicating possible seizures at night. Dr. Abou-Khalil noted that "it seems the seizures have recurred due to stress at that time, although it is hard to confirm the seizure occurrence and the number of seizures." In fact, such nighttime seizures were

virtually impossible to confirm because plaintiff lived alone with her seven-year-old daughter. Plaintiff also complained of difficulties with memory and tremors.

On November 15, 2002, defendant sent a letter to plaintiff requesting an updated certification of her disability. Defendant enclosed a form to be completed by plaintiff and her attending physician, as well as an estimated functional abilities form to be completed by the physician. Plaintiff replied that her seizures were continuing, accompanied by memory loss, tremors, and a lack of awareness of her surroundings. She noted that her medications made her drowsy, and she slept for three or four hours each afternoon. In his corresponding report dated December 13, 2002, Dr. Abou-Khalil responded that plaintiff continued to have seizures related to stress and suffered from sleepiness, constipation, memory loss, and an altered awareness with each seizure. Although he noted that "patient appears to be unable to tolerate any stress without increasing the frequency of her seizures," Dr. Abou-Khalil indicated that plaintiff's functional ability was not impaired until she had a seizure. He reiterated that plaintiff should not drive, operate heavy moving machinery, or be in high unprotected places.

On January 6, 2003, defendant's senior customer care specialist, Kellie Downey, initiated a surveillance request for the purpose of determining whether plaintiff's daily activities were consistent with her reported level of activities and the prescribed limitations. Ms. Downey also requested the status of plaintiff's driver's license and learned that plaintiff still had a valid driver's license with no restrictions. On January 15 and 16, 2003, defendant's investigator videotaped plaintiff driving her car near her home in Elizabethton, with her daughter as a passenger.

On January 17, 2003, defendant requested another medical review of plaintiff's records by Dr. Lee. After reviewing the medical information, he reported that plaintiff's seizure frequency was uncertain. Noting that "it is true sometimes partial seizures are difficult to treat and requires hospitalization to localize lesion in brain with help of video/EEG monitoring," he found "no such record" and no emergency room visits or prolonged hospitalization records to support the severe intractable nature of the partial seizure.[3] Dr. Lee concluded that plaintiff's current restrictions and limitations were reasonable, except for the opinion that plaintiff could not tolerate stress, which Dr. Lee found to be "very prophylactic."

On February 27, 2003, Ms. Downey sent a letter to Dr. Abou-Khalil, advising him of the definition of "disability" under the policy. The letter also advised Dr. Abou-Khalil that defendant's medical department had concluded that the driving restriction was reasonable, but the restriction of stress avoidance was "very prophylactic"; that defendant's vocational department had concluded that driving was not a material and substantial duty of plaintiff's occupation; that plaintiff had been observed driving through surveillance in disregard of his stated restrictions; and, that plaintiff's driver's license was not restricted in any way. Therefore, it was defendant's opinion that plaintiff was able to perform her occupation as nursing home administrator. Dr. Abou-Khalil was asked whether he agreed that plaintiff could return to work and, if not, why.

On March 12, 2003, Dr. Abou-Khalil responded by letter, stating that, although it appeared from defendant's investigation that plaintiff was driving, which she should not do, "your surveillance report does not change anything in my report." Noting that plaintiff's position as nursing home administrator entailed an enormous amount of responsibility and was accompanied by significant stress, Dr. Abou-Khalil opined that "[t]he fact is that Mona Evans has complex partial seizures and the frequency of her seizures increases when she is under stress, as it does for many

---

[3] As the district court aptly noted in its opinion, "[o]bviously Dr. Lee was not reviewing the entire record since exactly this kind of diagnostic monitoring had been performed by Dr. Khalil in 1999."

patients with epilepsy. . . . Therefore, I still feel it is in her best interest that she not return to work at this time."

Dr. Abou-Khalil's reply was reviewed by Dr. Lee, who responded by in-house e-mail that his previous opinion was unchanged and "[t]he fact that claimant is driving despite medical and state recommendation tells that claimant is not a prudent person."

On May 27, 2003, Ms. Downey telephoned plaintiff to advise her that her LTD benefits were being terminated. Following the phone call, plaintiff suffered a seizure requiring medical attention by paramedics called to her home. A letter sent by Downey to plaintiff on the same date advised her that her condition no longer met the policy definition of disability and, consequently, her LTD and life insurance benefits were being discontinued. The letter informed plaintiff that:

– defendant's medical department had determined that although the driving restriction was reasonable and supported, a restriction and limitation of stress avoidance was prophylactic;

– there were no records of video/electroencephalography monitoring, emergency room visits, or prolonged hospitalization in plaintiff's file to support the intractable nature of the complex partial seizures;

– Dr. Abou-Khalil had noted that it was hard to confirm the seizure occurrence and the number of seizures;

– the documented seizural activity and daytime sleepiness were largely self-reported;

– plaintiff had been observed driving in January 2003, despite medical recommendations and state requirements, indicating that plaintiff was not a prudent person;

– the vocational department classified plaintiff's occupation as "light work" which did not require her to drive; therefore she could perform her occupation within the restrictions indicated by Dr. Abou-Khalil; and

– in light of the determination that plaintiff could perform her occupation, her $245,000.00 waiver of premium life insurance policy benefit was also cancelled.

On June 9, 2003, plaintiff had an office visit with Dr. Abou-Khalil. He noted that she continued to have memory problems and suffered from hand tremors. The seizures were apparently completely controlled; but, in the past month there had been increased stress, and she had been waking up every morning with a postictal feeling. He noted that she had experienced two seizures in October 2002; one seizure in November; one in December; none in January or February of 2003; one in March; none in April; one longer seizure in May, followed by two minor ones the next day; and one on June 1 (the day her father suffered a heart attack).

On June 21, 2003, Dr. Abou-Khalil wrote a detailed letter to Ms. Downey, advising her as follows:

1. The seizures of Ms. Evans have been documented beyond any doubt, by recording them during a hospital admission in the epilepsy monitoring unit in 1999. I am attaching a copy of the epilepsy laboratory report, dated February 1999. Her seizures started without any warning. She was usually not aware that she had a seizure. When she now reports that she wakes up with a postictal feeling, I consider

this evidence that she is having seizures. Even if she is not aware of any seizure, there is the possibility that seizures are occurring that she is not aware of. Studies show that once seizures have been resistant to two drugs they have less than a 5% chance of becoming fully controlled with a new drug or a combination of drugs (Kwan P. and Brodie M., *New England Journal of Medicine*, February 2000). The odds are low that her seizures will come under complete control for a prolonged period of time.

2. Ms. Evans' typical seizures recorded in 1999 involved prolonged postictal aphasia. I doubt that Ms. Evans can do a good job as a Nursing Home Administrator with any recurrent seizures. As a nursing home administrator she needs her full mental capacity to make potentially important decisions. In my opinion, having episodes of prolonged postictal aphasia is not compatible with optimal performance as a nursing home administrator. Her job description requires, among other things, that she maintain a liaison with families, residents, the governing board, and medical staff, that she represent her facility at top level meetings, that she counsel, discipline or terminate personnel as necessary, that she meet with department directors and conduct in-service classes and training programs. Having intermittent seizures and the subsequent postictal impairment would make it impossible to perform these duties properly.

3. The issue of stress provoking seizures is a real one. Stress is probably the most important seizure-provoking factor in all patients, and not just Ms. Evans. The position of Nursing Home Administrator carries an enormous amount of responsibility. Since Ms. Evans has been away from her work environment, her seizures have improved. I agree that it is hard to eliminate stress from life. Nevertheless, if seizures are not fully controlled without stress, they will not be controlled in the presence of stress.

4. Regarding the issue of driving, she is not supposed to drive until seizure-free for 6 months. However, her driving against medical advice has no relevance to her disability.

On June 24, 2003, plaintiff sent defendant a letter constituting an appeal from its determination to discontinue her LTD benefits. In support of her appeal, plaintiff submitted her own affidavit reciting her history of seizures and additional exhibits, including the paramedics' report regarding the visit to plaintiff's home after plaintiff suffered her May 27, 2003, post-cancellation seizure, additional copies of hospitalization and monitoring records, and current medical notes.

On October 9, 2003, defendant had plaintiff's medical file reviewed by its vice-president and medical director, Dr. Alan Neuren. Dr. Neuren, who is board certified in psychiatry and neurology, concluded that the impact of stress upon plaintiff's seizures was entirely self-reported and had not been corroborated by medical studies. He found no indication that her employment caused worsening of her seizures and noted that once plaintiff began taking anti-convulsant medication, there were extended periods of time during which she was seizure free. Dr. Neuren concluded that medication adjustments, not plaintiff's absence from employment, caused the reduction in the frequency of her seizures. Dr. Neuren noted that no subsequent studies had been performed that documented the presence of breakthrough seizures while on anti-convulsants.

On October 17, 2003, defendant notified plaintiff that it had considered her appeal but adhered to its prior determination that she could perform her usual occupation and was no longer disabled under the terms of the LTD policy. Defendant thus upheld its decision terminating her LTD and insurance benefits.

Plaintiff subsequently filed the present lawsuit. The parties filed cross motions for judgment on the administrative record. On December 27, 2004, the district court issued a comprehensive memorandum opinion and order granting plaintiff's motion for judgment on the administrative record and denying defendant's motion. The court ordered the reinstatement of plaintiff's LTD and life insurance benefits and the payment of past due benefits, as well as accrued interest and reasonable attorney fees.

On January 13, 2005, defendant filed this timely notice of appeal.

### III.

"This Court reviews de novo the district court's ruling, applying the same legal standard as the district court." *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005) (citation omitted). Although we likewise ordinarily review an ERISA plan administrator's decision denying benefits de novo, *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 659-60 (6th Cir. 2004), where, as here, the plan administrator is given the discretionary authority to determine eligibility for benefits or to construe the plan terms,[4] "we review the administrator's decision to deny benefits using 'the highly deferential arbitrary and capricious standard of review.'" *Killian v. Healthsource Provident Adm'rs, Inc.,* 152 F.3d 514, 520 (6th Cir. 1998) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996)). "This standard 'is the least demanding form of judicial review of administrative action . . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'" *Id.* (alteration in original) (quoting *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442*, 64 F.3d 238, 241 (6th Cir. 1995)). Consequently, a decision will be upheld "'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'" *Id.* (quoting *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

While the arbitrary and capricious standard is deferential, "'it is not, however, without some teeth.'" *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998)). "[M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald*, 347 F.3d at 172.

We have recognized that a conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005); *see Killian*, 152 F.3d at 521 (observing "there is an actual, readily apparent conflict . . . , not a mere potential for one" where a company both funds and administers an LTD policy, because "it incurs a direct expense as a result of the allowance of benefits, and it

---

[4]The plan at issue clearly and unambiguously grants discretionary authority to defendant in its administration of the plan and determination of claims for benefits. Specifically, the fifth paragraph of the Certificate Section of the policy expressly provides the plan administrator with discretionary authority, stating in pertinent part: "When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."

benefits directly from the denial or discontinuation of benefits"). In this case, because defendant maintains such a dual role, "the potential for self-interested decision-making is evident." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d. 839, 846 n.4 (6th Cir. 2000). However, this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious. *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston,* 419 F.3d 501, 506 (6th Cir. 2005). The reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision. *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 n.2 (6th Cir. 2004).

Finally, absent a procedural challenge to the plan administrator's decision, this Court's review is limited to the administrative record of the benefit determination. *Kalish,* 419 F.3d at 511.

IV.

In reviewing the administrative record in this case, we are cognizant of certain guideposts that have been established by this Circuit with regard to ERISA benefit determinations. As the *McDonald* Court observed:

> Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.

347 F.3d at 169.

Unlike the mandatory deference accorded to treating physicians in Social Security cases, the Supreme Court has held in the ERISA context that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). The Supreme Court nonetheless admonished that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.*

Moreover, although we have found "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005), it is a factor to be considered in reviewing the propriety of an administrator's decision regarding benefits:

> We regard [the plan administrator's] decision to conduct a file review rather than a physical exam as just one more factor to consider in our overall assessment of whether Liberty acted in an arbitrary and capricious fashion. Thus, while we find that [the administrator's] reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly, we find that the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

*Id.* at 295. For the same reasons, the usefulness of an independent medical examination under particular circumstances likewise constitutes yet another element in the equation of the reasonableness of an administrator's benefits determination.

Several recent decisions issued by our Court have applied the arbitrary and capricious standard to ERISA benefit determinations and, in so doing, have underscored the principle set forth in *Black & Decker* that a plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician. These decisions are instructive with regard to the present matter.

For instance, in *McDonald*, we held that the ERISA plan administrator acted arbitrarily and capriciously in terminating the LTD benefits of the plaintiff, where the evidence of record indicated that his severe depression and aggressive personality disorder remained unchanged; his treating physicians unequivocally and repeatedly opined that he was totally incapable of returning to work due to his mental condition; two independent medical examiners also questioned the plaintiff's ability to return to work; a psychiatrist's initial report ambiguously stated that the plaintiff might be able to return to work in a very low stress environment on a limited trial basis; and, the psychiatrist's supplemental report, which accused the plaintiff of malingering, was significantly different from his initial report without any justification for the change, other than telephone contact from the defendant. 347 F.3d at 163-66. In these circumstances, we held that "[t]he mere possibility that a participant in an ERISA plan might be able to return to some type of gainful employment, in light of overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's decision to deny that participant's claim for LTD benefits." *Id*. at 170-71.

In *Moon,* this Court held that the termination of the plaintiff's disability benefits pursuant to an ERISA plan was arbitrary and capricious where the plaintiff's primary treating physician carefully documented that the plaintiff's uncontrollable labile hypertension rendered her unable to work, and the only contrary opinion came from one of the defendant's in-house staff physicians, who arrived at his opinion not upon an examination of the plaintiff, but rather upon a selective review of the administrative record. 405 F.3d at 374-78. In so holding, we noted that, "Dr. Feagin's role was not as a neutral independent reviewer, but as an employee of Unum. It is not enough for Unum to offer an explanation for the termination of benefits; the explanation must be consistent with the 'quantity and quality of the medical evidence' that is available on the record." *Id*. at 381 (quoting *McDonald*, 347 F.3d at 172). Factoring in the plan administrator's conflict of interest, we also observed that "when a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." *Id.* at 381-82.

In *Calvert*, this Court held that, in the context of the record as a whole and considering the defendant ERISA plan administrator's conflict of interest, the administrator acted arbitrarily and capriciously in denying the participant with a back injury further LTD benefits. 409 F.3d at 295-97. A neurosurgeon engaged by the administrator conducted a file review and opined that the participant's claimed limitations were subjective exaggerations, and there was no objective data in the record to support any restriction on the participant's activities. *Id*. at 296-97. We reiterated that

> there is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician. Where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate.

*Id*. at 297.

Under the circumstances, the Court found the neurosurgeon's file review to be "clearly inadequate" and his conclusions "incredible on their face" when compared to the objective data from the participant's x-rays and CT scans and the "thorough *objectively verifiable* [disability] determinations" of the Social Security Administration and the participant's treating physician. *Id*. at 296-97.

Most recently, in *Kalish*, we held that the ERISA plan administrator acted arbitrarily and capriciously in denying benefits to the participant on the basis of his cardiac condition where the administrator relied exclusively on an independent expert's file review that was "inadequate in several crucial respects." 419 F.3d at 510. Specifically, the expert opined that the participant could return to a position requiring "light activity," but did not state that the participant could return to his former "high-stress" position as director of transportation, which entailed the supervision of fifty employees and extensive travel: "[T]he fact that Kalish might be capable of sedentary work cannot be a rational basis for finding that he was not disabled, given that his former occupation required him to walk, stand, and reach for several hours a day." *Id.* at 507. Moreover, the independent expert's conclusory assertions in this regard failed to rebut the contrary medical conclusions of the physician who conducted regular physical examinations of the participant. *Id.* at 509. Finally, the expert's report neglected to mention the observations of the plan administrator's own field investigator that undermined the expert's diagnosis. *Id.* at 509-10. Under these circumstances, this Court concluded that the plan administrator improperly denied the participant's claim for benefits.[5]

When the present administrative record is considered within the parameters of the above precedents, we hold that defendant's decision to terminate plaintiff's LTD benefits was arbitrary and capricious. It is evident that defendant's conflict of interest arising from its dual role as administrator and insurer of the LTD policy interfered with an objective review of the record. Although not required to do so, defendant never sought independent medical review, either in the form of file review or an actual examination, but instead relied solely on file review by its in-house staff physicians. Significantly, the evidence contained in the administrative record shows that defendant ignored reliable medical evidence proffered by plaintiff. Defendant's letter to plaintiff terminating her benefits erroneously states that there was no video/electroencephalography monitoring and no emergency room visits or prolonged hospitalization records in plaintiff's file to support the intractable nature of the complex partial seizures. Plaintiff's seizures, however, are well-documented and supported by laboratory testing, e.g., the 1999 hospitalization.

Moreover, despite the unwavering expert medical opinion of plaintiff's treating physician, neurologist Dr. Abou-Khalil, that stress is probably the most important seizure-provoking factor in all patients, and not just plaintiff, and that plaintiff's high-stress position would exacerbate her condition, defendant nonetheless unreasonably discounted stress as merely a "prophylactic" factor that should be accorded minimal, if any, weight in its determination of disability. The physicians in defendant's employ who conducted the file reviews characterized the stress restriction as speculative and unverifiable, despite documented instances when stressful situations precipitated plaintiff's seizures. The district court, in its well-reasoned opinion, accurately noted that so-called "prophylactic" restrictions are not precluded from consideration in disability determinations under the terms of the LTD policy. The court further correctly noted that the LTD policy does not state that self-reported occurrences are to be accorded lesser significance when considering whether a person is able to work. Likewise, imprudent behavior (i.e., driving against doctor's orders) does not adversely impact a doctor's diagnosis or disqualify a person for benefits.

Furthermore, as the district court concluded, defendant's vocational analysis ignores unrefuted evidence that plaintiff's position as the senior nursing home administrator in charge of three health care facilities was a demanding and stressful occupation and, hence, incompatible with

---

[5]Cf. *Spangler,* 313 F.3d at 362 ("[W]e can only conclude that [the defendant] . . . 'cherry-picked' [the plaintiff's] file in hopes of obtaining a favorable report from the vocational consultant as to Spangler's work ability."); *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002) (applying a de novo review standard warranted under the circumstances and concluding that "[t]he evidence presented in the administrative record did not support the denial of benefits when only Provident's physicians, who had not examined Hoover, disagreed with the treating physicians").

her condition. Although defendant classifies the job as "light work," which presumably pertains to the sedentary aspect of such a position, defendant in its decision denying benefits does not address the mental aspect of the position and the uncontradicted evidence, consisting of Dr. Abou-Khalil's reports that the stressful nature of the job and plaintiff's documented postictal impairments (disorientation and memory loss) would make it impossible for her to perform such duties, and the job description itself (which sets forth the multitude of responsibilities of plaintiff's administrative position and states that "extreme mental stress can occur often for short periods"). Defendant's in-house physicians did not contradict this evidence.

Finally, a series of inter-office e-mails and memos between defendant's customer care specialists in early 2002 discussing the status of plaintiff's LTD and life insurance claims, and noting that they were "working on denying this claim" at that point in time, certainly indicate a predisposition toward terminating plaintiff's benefits and manifest the conflict of interest inherent in defendant's dual role as the decision-maker and payor of the LTD policy. The administrative record leaves no doubt that defendant's conflict of interest unduly influenced its evaluation of plaintiff's claim.

In sum, on the basis of the administrative record, the trial court did not err in ruling that defendant acted arbitrarily and capriciously in terminating plaintiff's LTD and insurance benefits. Defendant's reliance solely on file reviews by its in-house physicians is questionable in light of the critical credibility determinations made in those file reviews, the factual inaccuracies contained therein regarding plaintiff's treatment history, and the fact that the file reviews categorically dismissed the reliable opinion of plaintiff's treating physician that the stress factor militated against plaintiff's resumption of her administrative position. Defendant has failed to provide a reasoned explanation, based on the record and the express language of the LTD policy, for terminating plaintiff's LTD benefits.

V.

For the reasons set forth above, the district court's order granting plaintiff's motion for judgment on the administrative record, denying defendant's similar motion, reinstating plaintiff's LTD and insurance benefits, and awarding plaintiff past due benefits, plus accrued interest and reasonable attorney fees, is affirmed.