NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0435n.06

No. 10-1244

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jun 29, 2011*

LEONARD GREEN, Clerk

CHRISTINA HUNTER,

    Plaintiff-Appellant,

v.

LIFE INSURANCE COMPANY OF NORTH
AMERICA,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE: COOK, McKEAGUE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

In this action brought pursuant to the Employee Retirement Income Security Act ("ERISA"),

29 U.S.C. § 1001 *et seq.*, plaintiff Christina Hunter claims that her long-term disability ("LTD")

benefits were wrongfully terminated by defendant Life Insurance Company of North America

("LINA"). Hunter filed a motion for judgment on the administrative record and LINA cross-moved

for summary judgment. The district court granted defendant's motion for summary judgment and

denied plaintiff's motion, ruling that LINA's decision to terminate Hunter's LTD benefits was not

arbitrary and capricious. We disagree, and therefore reverse and remand.

I.

Hunter, a 53-year-old widow, has a long and well-documented history of numerous joint and

spinal conditions known to cause chronic pain. Such conditions include degenerative joint disease,

degenerative arthritis, rheumatoid arthritis, osteoarthritis, scapular pain, fibromyalgia, spondylolithesis, and spinal stenosis. It is undisputed that as a result of these afflictions, Hunter has undergone over ten surgical procedures on her hips, knees, shoulders, and spine. According to Hunter's treating physicians, Hunter continues to suffer from profound, chronic pain that severely limits her functional capacity.

In July 1997, Hunter was hired by William Beaumont Hospital and thereafter promoted to the position of Revenue Cycle Manager. As a Revenue Cycle Manager, Hunter was required to "occasionally" lift and carry ten pounds, "frequently" stand and walk, and "occasionally" climb stairs. In addition, Hunter was required to "occasionally" work overtime and extended shifts. The word "occasionally" indicates that the activity is required 1-33% of the working day, and the word "frequently" indicates that the activity is required 34-66% of the working day. However, due to her poor health and an upcoming surgery, Hunter's final day of work at Beaumont was March 8, 2004. Hunter has not engaged in any substantial gainful activity since then.

Citing chronic pain, severe arthritis, and numerous surgical procedures, Hunter applied for LTD benefits under a LINA policy issued to Beaumont pursuant to its ERISA plan. As a Class 1 employee, Hunter was entitled to LTD benefits if, "because of Injury or Sickness, . . . she [was] unable to perform all the material duties of . . . her regular occupation[.]" Based upon the medical evidence, LINA approved Hunter's request for LTD benefits on October 12, 2004.

In accordance with LINA policy requirements, Hunter applied for social security disability benefits. In May 2005, the Social Security Administration ("SSA") found Hunter to suffer from a

"disability" as defined by the Social Security Act, and thus unable to engage in any substantially gainful activity as of November 25, 2003. Thereafter, Hunter's monthly LTD benefits under the LINA policy were reduced by the amount of her SSA award.

In 2007, LINA reviewed and updated Hunter's medical files to determine her eligibility for continued LTD benefits. As part of this review, LINA requested one of Hunter's treating physicians, Dr. Patricia Peters, to complete a physical ability assessment form.[1] This assessment revealed that Hunter was capable of "occasionally" sitting, standing, and walking, but was unable to work overtime or extended shifts. Based upon Dr. Peters' opinion, LINA determined that Hunter would be unable to perform her prior occupation as a Revenue Cycle Manager, but referred her file for additional review.

In September 2007, LINA hired PhotoFax, Incorporated to surveil Hunter and document her functional capacity. This surveillance took place between September 12 and September 15, 2007. On September 12, 14, and 15, Hunter did not leave her home. On September 13, Hunter was captured on video as she carried groceries from the trunk of her vehicle into her home. The

---

[1]LINA asserts that in 2007, it received a physical ability assessment form from Dr. John Tower, one of Hunter's treating physicians. However, this form is not contained within the administrative record. Instead, LINA refers the court to the termination letter it sent to Hunter in 2008, which describes the results of the alleged assessment. However, LINA's description of the physical ability assessment is hearsay, Fed. R. Evid. 801(c), and fails to comply with the best evidence rule, Fed. R. Evid. 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress."). Accordingly, we do not consider this evidence.

surveillance report notes that Hunter "removed a gallon of milk, small boxes of wine, and a case of pop from her trunk."

In January 2008, LINA required Hunter to undergo a functional capacity evaluation. This evaluation revealed a significantly diminished functional capacity that limited Hunter's ability to perform an occupation "even within the Sedentary work category." Specifically, the physical therapist found that Hunter was unable to lift objects over two pounds, carry objects over one pound more than fifty feet, climb stairs, stoop, kneel, crouch, crawl, or work overtime or extended shifts. However, the physical therapist found that Hunter was able to sit, stand, and walk on an "occasional" basis. In making these findings, the physical therapist noted that Hunter was consistent both when aware and unaware of observation.

Also in January 2008, LINA hired PhotoFax to perform additional surveillance of Hunter. On January 7, Hunter was observed driving to and from a medical office and pumping gasoline. On January 8, surveillance captured Hunter as she exited her functional capacity evaluation, walking slowly, hunched over, and with the assistance of a standard cane. On January 9, Hunter was observed as she walked from an automobile dealership back to the passenger side of her vehicle. She moved slowly, but in a fluid and fully erect manner, and without the use of a cane. Hunter was later observed test driving a vehicle for a period of fifteen minutes.

In April 2008, LINA sent Hunter's medical records and the surveillance videos to MCMC, LLC, for an independent file review. Clayton Cowl, M.D., a practitioner of internal, preventative, and occupational medicine, performed the review. Dr. Cowl determined that while Hunter had

"well-documented impairments involving degenerative changes . . . of the lumbar and cervical spinal regions . . . . [t]he video surveillance footage is quite incongruent with the claimant's complaints" and "introduces concern for malingering[.]" Therefore, Dr. Cowl concluded that Hunter was able to perform work "at a sedentary level . . . as defined by [the] Department of Labor classification." However, Dr. Cowl neither contacted Hunter's treating physicians nor examined Hunter.

Based primarily upon the analysis of Dr. Cowl and the surveillance videos, LINA terminated Hunter's LTD benefits on May 13, 2008. Specifically, LINA determined that Hunter was physically capable of returning to her prior occupation of Revenue Cycle Manager, which was categorized as a "sedentary" position. Hunter thereafter filed a timely appeal.

In challenging the termination of her LTD benefits, Hunter supplemented her medical file with the affidavits of David Montgomery, M.D. and Pramod Kerkar, M.D., two of her treating physicians.[2] Both doctors concluded that Hunter was unable to return to her prior occupation as a Revenue Cycle Manager and that the surveillance videos did not demonstrate otherwise. Dr. Kerkar specifically noted that based upon Hunter's "multiple spinal and joint pathologies [that] will never be cured . . . . [Hunter] will always suffer with debilitating pain to some extent[,]" and that the treatment he provides is "intended to manage Mrs. Hunter's pain so that she may maintain a sense of personal dignity by performing the most basic activities of daily living, i.e., bathe and dress herself, cook for herself, perform light housework, and shop for essentials."

---

[2]Dr. Montgomery is an orthopaedic surgeon and Dr. Kerkar is an anesthesiologist.

For purposes of Hunter's appeal, LINA sent Hunter's file to MES Solutions for a second independent file review. On January 12, 2009, Frank Polanco, M.D., board certified in preventative and occupational medicine, with added expertise in pain medicine, provided an opinion regarding Hunter's functional capacity. In his report, Dr. Polanco provided a detailed summary of Hunter's medical records without disputing the nature or extent of the underlying diagnoses. Nevertheless, relying upon the surveillance videos, Dr. Polanco concluded that Hunter retained the functional capacity to perform "sedentary" work requiring "intermittent (less than 33%) standing and walking and lifting less than 10 pounds." Dr. Polanco noted that he disagreed with the treating physicians regarding the extent of Hunter's physical limitations, and that Hunter's 2008 functional capacity evaluation "significantly underestimate[d] her physical capacity." Dr. Polanco did not directly assess the specific requirements of Hunter's former position as a Revenue Cycle Manager and did not perform a physical examination.

Relying on Dr. Polanco's opinion, LINA upheld its termination of Hunter's LTD benefits on January 16, 2009, finding that Hunter was able to perform her prior work as a Revenue Cycle Manager, a "sedentary" position. Hunter thereafter filed suit in the United States District Court for the Eastern District of Michigan. Upon Hunter's motion for judgment on the administrative record and LINA's cross-motion for summary judgment, the district court held in favor of LINA, granting summary judgment from the bench. This appeal followed.

II.

"This Court reviews de novo the district court's ruling, applying the same legal standard as the district court." *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005). "Although we likewise ordinarily review an ERISA plan administrator's decision denying benefits de novo, where, as here, the plan administrator is given the discretionary authority to determine eligibility for benefits or to construe the plan terms, we review the administrator's decision to deny benefits using the highly deferential arbitrary and capricious standard of review." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006) (internal quotation marks, footnote, and citations omitted). The parties do not dispute that the policy grants LINA discretionary authority to determine benefit eligibility.

The arbitrary and capricious standard "is the least demanding form of judicial review of administrative action. . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (internal quotation marks and citation omitted). Consequently, a decision will be upheld "if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Id.* (internal quotation marks and citation omitted). "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

While the arbitrary and capricious standard is deferential, "'[i]t is not, however, without some teeth.'" *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998)). "[M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald*, 347 F.3d at 172. However, this review does not extend outside the administrative record. *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 511 (6th Cir. 2005).

This court has recognized that a conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005). In this case, because defendant maintains such a dual role, "the potential for self-interested decision-making is evident." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000). However, this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious. *Kalish*, 419 F.3d at 506. The reviewing court looks to see if there is evidence that the conflict in any

way influenced the plan administrator's decision. *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 n.2 (6th Cir. 2004).

III.

Based upon our review of the administrative record, we hold that LINA's termination of Hunter's LTD benefits was arbitrary and capricious. First and foremost, LINA failed to adequately consider Hunter's prior occupational requirements. In order to be considered "disabled" under the LINA policy, Hunter is required to demonstrate that "because of Injury or Sickness, . . . she is unable to perform *all* the material duties of . . . *her regular occupation*[.]" (Emphasis added.) As a Revenue Cycle Manager, Hunter was required to frequently walk and stand, and occasionally work overtime and extended shifts. LINA does not dispute that the employer-provided "job requirements" form is controlling regarding the physical requirements of Hunter's prior position. However, LINA did not specifically assess Hunter's ability to perform these, or any other specific physical requirements of her prior occupation.

In terminating Hunter's LTD benefits, LINA found that Hunter had the functional capacity to perform "sedentary" work. However, while "the fact that a claimant is able to engage in sedentary work is an appropriate consideration in some cases," it is not an appropriate consideration when "the Plan language [at issue] explicitly state[s] that a participant is disabled so long as 'he is unable to perform *all* of the material and substantial duties of *his* occupation.'" *Kalish*, 419 F.3d at 506. Thus, the fact that Hunter "might be capable of sedentary work cannot be a rational basis for finding that [she] was not disabled," given that her former occupation required her to walk and stand for several

hours a day. *Id.* at 507; *see also Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618 n.3 (6th Cir. 2006) (noting that a district court's reasoning was in error "because it relies on a general notion of 'sedentary' work rather than on the duties that [the claimant's] occupation entailed"). Indeed, in denying Hunter's appeal, LINA categorized her prior occupation as "sedentary," meaning that it involved "walking or standing for brief periods of time" or "occasionally." However, it is undisputed that as a Revenue Cycle Manager, Hunter was required to walk and stand for 34-66% of the working day.

In this case, neither LINA nor its evaluating physicians assessed whether Hunter would be able to stand or walk for the intervals required by her position as Revenue Cycle Manager, and nothing in the administrative record indicates that Hunter can return to a job with such requirements.[3] In fact, Dr. Polanco found that Hunter would be able to stand and walk on an "intermittent" basis, meaning "less than 33%" of the working day. This finding suggests that Hunter would be *unable* to perform the more demanding walking and standing requirements of her former occupation. Dr. Cowl similarly determined that Hunter was able to work at a "sedentary level" as defined by the Department of Labor. This classification requires a claimant to be able to walk and stand only "occasionally." 20 C.F.R. § 404.1567(a). Indeed, if a position requires "a good deal of walking or standing," it is classified as "light work." 20 C.F.R. § 404.1567(b).

---

[3]Both Drs. Cowl and Polanco listed Hunter's "job requirements" as a document assessed as a part of their file review. However, mere mention of Hunter's job description, without analysis, is insufficient to demonstrate that these physicians actually considered Hunter's ability to perform the physical demands of her prior occupation. *See Elliott*, 473 F.3d at 619; *McDonald*, 347 F.3d at 172.

Moreover, there is nothing in the administrative record indicating that Hunter has the ability to work overtime or extended shifts, express requirements of her prior occupation. In fact, all the medical evidence indicates that Hunter would be unable to work anything more than a regular forty-hour position. Accordingly, because LINA did not assess the actual requirements of Hunter's prior occupation, specifically the walking, standing, and overtime requirements, its decision to terminate her LTD benefits was arbitrary and capricious. *See Elliott*, 473 F.3d at 618 n.3; *Evans*, 434 F.3d at 879-80; *Kalish*, 419 F.3d at 506-07.

IV.

While LINA's failure to address the actual requirements of Hunter's prior occupation is sufficient to render its decision to terminate her LTD benefits arbitrary and capricious, our review reveals additional errors that further support this conclusion. Here, significant evidence supports a disability finding, such as the 2007 physical ability assessment performed by Dr. Peters, the 2008 functional capacity evaluation, the undisputed medical records demonstrating Hunter's numerous medical conditions, and the affidavits of Drs. Montgomery and Kerkar. Generally, when a plan administrator chooses to credit the medical opinion of one doctor over another, the decision cannot be said to have been arbitrary and capricious. *Id.* at 169. However, this court has also noted that administrators cannot arbitrarily disregard reliable medical evidence demonstrating disability in favor of medical evidence lacking in thoroughness and reliability. *See Evans*, 434 F.3d at 877-79 (citing cases).

In this case, LINA's decision to credit the opinions of Drs. Cowl and Polanco over other medical evidence is questionable for several reasons. First, unlike Drs. Montgomery and Kerkar, Drs. Cowl and Polanco did not physically exam Hunter. The failure to perform a physical examination is "one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *See Kalish*, 419 F.3d at 508. Indeed, the lack of a physical examination is particularly troublesome where, as here, the file reviewers make critical credibility determinations. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 n.6 (6th Cir. 2005) ("[T]here is nothing inherently improper with relying on a file review . . . . Where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate.").

In addition, the analyses provided by Drs. Cowl and Polanco were less than thorough. Both Drs. Cowl and Polanco describe Hunter's detailed medical history, but then summarily conclude that Hunter's complaints of pain and limited functionality "are not supported" by the medical evidence. *See Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 170 (6th Cir. 2007) (noting that "conclusory and unsupported statements that the documentation of [the claimant's] functional capacity was insufficient to support a finding of disability" is not enough to uphold the denial of LTD benefits). These conclusions are particularly dubious in light of the fact that neither doctor disputes the nature or extent of Hunter's numerous joint and spinal conditions.

In opining on Hunter's level of functionality, Drs. Cowl and Polanco rely exclusively on what they both perceive as inconsistencies between Hunter's asserted level of functionality (documented during her 2008 functional capacity evaluation) and her functionality displayed in the surveillance videos. However, while the surveillance footage reveals some discrepancies between Hunter's stated and observed functionality,[4] these inconsistencies are relatively minor, and do not indicate that Hunter can perform all the physical duties of her former occupation. *See Hanusik v. Hartford Life Ins. Co.*, No. 06-11258, 2008 WL 283714, at *4 (E.D. Mich. Jan. 31, 2008) (noting that surveillance footage of the claimant walking thirty minutes, operating a car, and performing other small tasks, "fails to show Plaintiff either performing any single or combination of activities for an eight . . . hour period[.]"); *Wilson v. Life Ins. Co. of N. Am.*, 424 F. Supp. 2d 1146, 1157 n.6 (D. Neb. 2006) ("Nothing in the record comes close to establishing that [the claimant's] activities of daily living could reasonably be equated with the demands of a full-time job."). Indeed, out of over eighty hours of surveillance, less than thirty minutes capture Hunter engaging in any activity whatsoever.[5]

---

[4]During her functional capacity evaluation, Hunter asserted that she could only sit for ten minutes, stand for two minutes, walk for five minutes, drive for five minutes, and lift one pound without aggravating her symptoms. Based upon the surveillance videos, these statements appear to be exaggerations.

[5]LINA places great emphasis on this court's unpublished opinion in *Rose v. Hartford Financial Services Group, Inc.*, 268 F. App'x 444 (6th Cir. 2008). However, *Rose* is distinguishable. In *Rose*, the claimant was surveilled as she conducted herself in a manner contrary to her claimed level of functionality. *Id.* at 451. However, the inconsistencies between the claimant's stated level of functionality and the surveillance videos were more extreme than those presented here. For example, the claimant in *Rose* asserted she could lift no more than three to four pounds, but was observed lifting a 37.5 pound bag of dog food. *Id.* at 451-52. Moreover, the claimant in *Rose* provided "little" evidence demonstrating her claimed disability. *Id.* at 450-52. In contrast, Hunter

Hunter has never disputed her ability to occasionally sit, stand, walk, reach, or drive. Moreover, Drs. Montgomery and Kerkar opined that the "non-exertional" activities displayed in the surveillance videos do not indicate that Hunter is able to perform the requirements of her previous occupation. While Dr. Polanco had the opportunity to address and refute these opinions, he failed to do so. This failure diminishes the strength of Dr. Polanco's conclusions. *See Calvert*, 409 F.3d at 296 (finding a reviewing physician's report to be inadequate because, even though the reviewing physician "does mention [the claimant's doctors] by name, he does not explain why their conclusions . . . were rejected out-of-hand").

In terminating Hunter's LTD benefits and denying her appeal, LINA failed to explain why it credited the medical opinions of Drs. Cowl and Polanco over those of Drs. Montgomery and Kerkar, particularly with regard to the significance of the surveillance videos. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); *Elliott*, 473 F.3d at 620 ("[The administrator] failed to offer any reason for rejecting [the treating physician's] conclusions about [the claimant's] ability to work. Generally speaking, a plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion."). While treating physicians are not afforded mandatory deference as required in the Social Security context, *Evans*, 434 F.3d at 877, the fact that LINA "gave greater weight to a non-treating physician's opinion for no apparent reason lends force to the

has provided substantial medical evidence supporting her claimed disability.

conclusion that [it] acted arbitrarily and capriciously," *Elliott*, 473 F.3d at 620 (internal quotation marks and citation omitted).

Finally, we note that LINA failed to consider the SSA's determination regarding Hunter's disability. Generally, an ERISA plan administrator is not bound by an SSA determination finding of total disability. *Whitaker*, 404 F.3d at 949. However, it is inappropriate for a plan administrator to ignore an SSA award in making benefit determinations, especially when the claimant was *required* to apply for SSA benefits. *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 553 (6th Cir. 2008); *Calvert*, 409 F.3d at 293-95.[6] Indeed, "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, casts additional doubt on the adequacy of their evaluation of . . . [a] claim[.]" *Calvert*, 409 F.3d at 294-95 (internal quotation marks and citation omitted). In this case, LINA required Hunter to apply for SSA benefits, and once a favorable determination was obtained, LINA's payments to Hunter were significantly lessened. Accordingly, LINA's failure to address Hunter's favorable SSA determination is another factor indicating that its decision to terminate Hunter's LTD benefits was arbitrary and capricious.[7]

---

[6]Mere mention of a favorable SSA determination "is not the same as a discussion about why the administrator reached a different conclusion from the SSA." *Bennett*, 514 F.3d at 553 n.2. Here, while the SSA award is listed by Dr. Polanco as a document reviewed in forming his opinion, the SSA's determination is never expressly discussed or refuted. Dr. Cowl did not review the SSA award for purposes of his file review.

[7]The SSA award was two years old at the time Hunter's LTD benefits were terminated. Accordingly, while LINA's failure to address the award supports an arbitrary and capricious finding, this failure, standing alone, would not require the reversal of LINA's termination decision. *Cox v. Standard Ins. Co.*, 585 F.3d 295, 303 (6th Cir. 2009) (noting that the failure to consider an SSA determination that was made two years prior to the administrator's review of the claimant's LTD

V.

In sum, "[i]t is evident that defendant's conflict of interest arising from its dual role as administrator and insurer of the LTD policy interfered with an objective review of the record." *Evans*, 434 F.3d at 879. LINA failed to assess Hunter's ability to perform the physical requirements of her former position as a Revenue Cycle Manager, and there is no evidence in the record indicating that Hunter would be able to perform the standing, walking, or overtime requirements of the job. In addition, LINA arbitrarily disregarded credible evidence demonstrating Hunter's disability in favor of medical evidence lacking in thoroughness and reliability and failed to address and distinguish Hunter's favorable SSA award. Accordingly, we hold that the termination of Hunter's LTD benefits was arbitrary and capricious.

VI.

This leaves us with the question of remedy. "In cases such as these, courts may either award benefits to the claimant or remand to the plan administrator." *Elliott*, 473 F.3d at 621. In this case, we find that remand to LINA is appropriate. "[W]here the problem is with the integrity of [the plan's] decision-making process, rather than that [a claimant] was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Id.* at 622 (internal quotation marks and citation omitted). LINA's decision-making process, particularly its failure to address Hunter's actual job requirements, renders its determination arbitrary and capricious. Accordingly, we remand this matter to the district court with instructions to further

claim did not render the decision arbitrary and capricious).

remand to LINA. "Such a remedy will allow for a proper determination of whether, in the first instance, [Hunter] is entitled to [continued] long-term disability benefits." *Id.*

We reverse and remand. On remand, the district court is directed to further remand this matter to LINA for further proceedings and de novo consideration of Hunter's LTD claim consistent with this opinion.