**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 13, 2011

No. 10-20455

Lyle W. Cayce
Clerk

JOHN R. YOUNG,

Plaintiff–Appellee,

v.

MERRILL LYNCH & CO., INC.,

Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-1799

Before SMITH, DeMOSS, and OWEN, Circuit Judges.

PER CURIAM:[*]

Prior to his resignation, John Young worked as a trader at Merrill Lynch & Co. While at Merrill Lynch he participated in the firm's "Long-Term Incentive Compensation Plan for Managers and Producers" (LTICP or the Plan). Merrill Lynch contended that by resigning from the firm, Young lost his right to previously awarded, but unexercised, Restricted Units under the Plan. Young filed suit. The district court granted summary judgment to Young, holding—under the applicable standard of review—that Merrill Lynch's

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-20455

interpretation of the Plan was arbitrary. We reverse.

**I**

John Young began working at Merrill Lynch as a structured credit trader in 2006, and held the title of managing director. While at Merrill Lynch he participated in the Plan. The Plan was designed to provide long-term incentives to key employees, to attract and retain top-flight employees, to encourage long-term stock ownership by employees, and to align the interests of those employees with those of the stockholders. Under the Plan, the Management Development and Compensation Committee of the Board of Directors (the Committee) had "sole and complete authority," "[s]ubject to the provisions of the Plan," to administer and construe the Plan. The Plan stated that the Committee's determinations "shall be final and binding." The Plan was governed by New York law.

At issue in this case are 14,802 Restricted Units—each providing the right to receive one share of Merrill Lynch stock or its cash value—granted to Young in 2006 that have been heretofore unexercised. In general, employees lost their rights to Restricted Units not exercised when they left Merrill Lynch. Young asserted that he had a right to his Restricted Units under an exception to that general rule, stating that he left the firm for "Good Reason" after a "Change in Control." These are both contractual terms drawn from the Plan.

Merrill Lynch executed an agreement and plan of merger with Bank of America on September 15, 2008, and the merger was to occur—and did occur—on January 1, 2009. Young received his 2008 bonus in December 2008, after the merger agreement was signed but before the merger was consummated. He resigned from Merrill Lynch in February 2009, roughly one month after the merger had occurrred.

In § 8.1, the Plan granted participants the right of payment of the value of their unexercised Restricted Units if there was a corporate Change in Control

No. 10-20455

and the participant was either terminated "without Cause" or resigned "for Good Reason."[1]  Young asserted that he had resigned for Good Reason following a Change in Control.  Good Reason was defined in the Plan's § 8.5, and certain diminutions in a Plan participant's bonus after a Change in Control compared to previous bonuses constituted Good Reason.  The parties do not dispute on appeal that Young would have had "Good Reason" if the December 2008 bonus, paid between the merger agreement's signing and the consummation of the merger, had been instead paid after January 2009, when the merger occurred.

The parties have focused on whether the date of the Change in Control applicable to Young's situation should be the date that the merger agreement was signed or the date that the merger occurred.  The determination of when a Change in Control occurs was governed by § 8 of the Plan.  As noted above, § 8.1 established the right of payment of the value of Restricted Units when an eligible employee left for Good Reason as defined in § 8.5.  The title of § 8.2 was "A Change in Control," and the sub-section defined it as an event "of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934" and offered non-exclusive examples.  The parties have stipulated that the Merrill

---

[1] Section 8.1 provides:

**Section 8.1  Value of Payments Upon Termination After a Change in Control.**

Any other provision of the Plan to the contrary notwithstanding and notwithstanding any election to the contrary previously made by the Participant, in the event a Change in Control shall occur and thereafter the Company shall terminate the Participant's employment without Cause or the Participant shall terminate his or her employment with the Company for Good Reason, the Participant shall be paid the value of his or her Performance Shares, Performance Units, Restricted Shares, Restricted Units, Stock Options, Stock Appreciation Rights, and Other ML & Co. Securities in a lump sum in cash, promptly after termination of his or her employment but, without limiting the foregoing, in no event later than 30 days thereafter.

Lynch–Bank of America merger on January 1, 2009 constituted a Change in Control under § 8.2. Young contends, however, that by virtue of § 8.3, whenever a merger agreement is executed, the date of the merger agreement and not the date that the merger actually occurs is deemed the operative Change in Control date. Section 8.3, titled "Effect of Agreement Resulting in Change in Control," stated:

> If ML & Co. executes an agreement, the consummation of which would result in the occurrence of a Change in Control as described in Section 8.2, then, with respect to a termination of employment without Cause or for Good Reason occurring after the execution of such agreement (and, if such agreement expires or is terminated prior to consummation, prior to such expiration or termination of such agreement), a Change in Control shall be deemed to have occurred as of the date of the execution of such agreement.

Merrill Lynch responded to Young's request for his Restricted Units by stating that it construed the date of Change in Control relevant to Young as the date of the consummation of the merger—which occurred after his bonus was paid. Thus, Merrill Lynch contended, his bonus could not be linked to the Change in Control and therefore Good Reason was not established. In a second letter Merrill Lynch denied that § 8.3 controlled, stating that the provision relates only to those employees who "are terminated or resign for good reason prior to [the] closing of a transaction" by "'deem[ing]'" the transaction to have occurred earlier. The parties have stipulated that the Committee in charge of administering the Plan met, in December 2008 before the merger was consummated and before Young resigned, and discussed potential treatments of the Plan's benefits. The stipulation reflects that in December 2008, the Committee "addressed the subject of Merrill Lynch's equity plans providing for possible treatments for employees' stock-based awards upon termination, including terminations following a change in control, and the need to establish rules for interpreting plan provisions where termination rules had provided for several possible treatments for employees." Merrill Lynch has represented and

No. 10-20455

Young does not contest that Merrill Lynch has applied the date of the signing of the merger agreement, September 15, 2008, as the Change in Control date for those individuals who left the firm between the merger agreement's signing and the consummation of the merger pursuant to its reading of § 8.3. The Committee did not apply the date that the merger agreement was signed to Young because he resigned after the merger actually occurred.

The parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of Young and denied Merrill Lynch's motion. It recognized that New York grants highly deferential review of a determination made by a committee vested with sole interpretive authority. Nonetheless, the court determined that the requisite decrease in Young's bonus had been demonstrated and that the express language of § 8.3 compelled a determination that a Change in Control occurred on the date that the merger agreement was signed. This provided Young Good Reason for his resignation, the district court concluded. The court applied the same date to calculate the Units' Pre-CIC Value.

Merrill Lynch now appeals to this court. Our jurisdiction over this appeal is properly vested pursuant to 28 U.S.C. § 1291.

## II

We review a grant or denial of summary judgment de novo, applying the same standards as the district court.[2] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]

The Plan is governed by New York law, under which our review is highly deferential. The Plan vested "sole and complete authority" to interpret its

---

[2] *Robinson v. Orient Marine Co. Ltd.*, 505 F.3d 364, 365 (5th Cir. 2007) (citing *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003)).

[3] FED. R. CIV. P. 56(a).

provisions in the Committee.  New York's highest court held in *Gitelson v. Du Pont* that a plan vesting "[s]ole authority" in a board limited a court's review of a payment denied by that board to a determination of whether the claimant met his burden "to show that the board's ruling was motivated by bad faith, or arrived at by fraud or arbitrary action."[4]  This is so because New York considers such a payment right "a conditional contract right," and therefore the payment right is subject to the contract's conditions—including the sole authority provision.[5]  The instant contract vested "sole and complete authority" in the Committee.

Here there has been no allegation of bad faith or fraud.  Therefore, we consider de novo whether Merrill Lynch's interpretation of the Plan constituted an arbitrary action.  New York law regarding arbitrary actions has been characterized as requiring a determination that an administrator's decision lacks "any rational factual basis or was made without reference to relevant facts and contractual provisions."[6]  This has been termed a "heavy burden."[7]

Our inquiry is guided by a previous decision of this court.  In *Matthews v. Swift & Co.*, we interpreted a "sole discretion" provision in a contract under New York law.  There, we applied *Gitelson*'s deferential standard of review.[8]   Here, as in *Matthews*, no party has argued that it contravenes our public policy to apply this New York standard of review.[9]

In *Matthews* we strove to uphold the strong deference of the relevant

---

[4] 215 N.E.2d 336, 337-38 (N.Y. 1966).

[5] *Id.* at 338.

[6] *Brooks v. Cohen & Steers, Inc.*, 817 N.Y.S.2d 235, 236 (N.Y. App. Div. 1st Dep't 2006) (citing *Gehrhardt v. Gen. Motors Corp.*, 581 F.2d 7, 12 (2d Cir. 1978)).

[7]  *Gehrhardt*, 581 F.2d at 11.

[8] 465 F.2d 814, 817-18 (5th Cir. 1972).

[9] *Id.* at 818.

standard. In evaluating the decision of a pension board with respect to a purported "permanent disability," we cautioned that "the discretion of the judge cannot be substituted for that of the [p]ension [b]oard without departing from the terms of the contractual obligation."[10] Therefore, we held that the claimant "ha[d] the burden of proving such a clear case of permanent disability that no honest tribunal could reach any other decision and the burden of proving that any other decision is or would be arbitrary, fraudulent or in bad faith."[11] In the instant case, Young has the resulting burden to show that no honest tribunal could have construed the Plan in any manner but his proffered reading and that Merrill Lynch has advanced an arbitrary reading.

Young has not carried that burden. Looking at the relevant facts and provisions, Merrill Lynch concluded that § 8.2 dictated that the merger's consummation date was the Change in Control date for those individuals who resigned after the agreement was signed and after its consummation. Merrill Lynch construed § 8.3 as providing a "deemed" date for the Change in Control only for those who left Merrill Lynch between the merger's signing and consummation. Indeed, the parties have stipulated that consummation of the merger agreement on January 1, 2009 "resulted in the occurrence of a 'Change in Control,' as described in Section 8.2." Accordingly, there are two Change in Control dates potentially applicable. The question is which applies when the bonus payment amounting to "Good Cause" occurs after the date the merger agreement was signed but before the merger actually occurs, and Young's termination of his employment occurred after the later of the two Change in Control dates. The Plan does not so clearly support Young's position that the Committee's interpretation of the Plan was arbitrary. In fact, Young's construction of the Plan reads the actual date of the merger, which the parties

---

[10] *Id.* at 820-21.

[11] *Id.* at 821.

have stipulated constituted a Change in Control, out of the Plan entirely in a merger situation. According to Young, the *only* Change in Control date that can apply once a merger agreement has been signed is the date of the signing of that agreement. The actual date the merger occurs is irrelevant, according to Young, all because of § 8.3. We submit that the meaning of § 8.3 is not so clear, either standing alone or when considered with other provisions of the Plan.

The Plan provides in § 8.1 that "[i]n the event a Change in Control shall occur and *thereafter* . . . the Participant shall terminate his or her employment with the Company for Good Reason, the Participant shall be paid. . ." (emphasis added). A plausible construction of this provision is that both the termination as well as the Good Cause must occur after the same Change in Control date. Young's Good Cause occurred after a Change in Control, if the merger agreement's signing date is deemed a Change in Control, but he terminated his employment after a subsequent and different Change in Control date, January 1, 2009, when the merger actually occurred.

Merrill Lynch has essentially construed the Plan as providing two separate periods of time within which within there could have been resignations for Good Reason. To put it somewhat colloquially, the clock for resignations based on Good Reason in the run-up-to-the-merger era began to run on the signing date of the agreement, and that clock ran out when the merger, which both parties agree was a Change in Control, actually occurred. Resignations referable to actions taken within that pre-merger window must occur within that window. For employees who remained to see what the merged company might hold for them, a new Change in Control date governed, January 1, 2009. Resignations occurring after that date would have to be based on Good Reason occurring after that date.

Another plausible construction of the Plan, which Merrill Lynch did not adopt and Young does not embrace, is that § 8.3 is designed to apply, and "a Change in Control shall be deemed to have occurred as of the date of the

execution of" a merger agreement, if and only if "such [merger] agreement expires or is terminated prior to consummation" of the merger. In other words, § 8.3 applied only in the circumstance in which a merger agreement is signed, but the merger does not occur. Under such circumstances, it is necessary to *deem* a Change in Control date because no Change of Control actually occurred. Applying this interpretation, an employee who received a smaller-than-previous-years' bonus after a merger agreement was signed would be entitled to the value of Restricted Units if she terminated her employment for Good Reason before the merger agreement expired or was terminated. She would not, however, have grounds to receive the value of Restricted Units if she resigned after the merger agreement expired or terminated.

Other scenarios are possible and other interpretations of the Plan would not be arbitrary. Hypothetically at least, it could not be known in some situations whether the merger would occur on January 1, 2009, as contemplated, until more than thirty days after a resignation. For example, if an employee resigned for Good Reason on November 1, 2008, payment was due well before January 1, 2009 because, under § 8.1, employees who resigned for Good Reason were entitled to receive the value of their Restrictive Units within thirty days after their resignation. Section 8.3 could be read as deeming the applicable control date for such employees to be the date that the merger agreement was signed.

Though Young offers another alternative reading of the Plan, he fails to carry his "heavy burden."[12] He asserts that the text of the Plan unambiguously supports his reading. But our task is not to construe the Plan as a matter of first impression, but rather to evaluate whether Merrill Lynch acted arbitrarily in its construction of the Plan. As noted above, Merrill Lynch's interpretation was not arbitrary.

---

[12] *Gehrhardt*, 581 F.2d at 11.

No. 10-20455

Similarly unavailing is Young's passing contention that § 8.6 of the Plan precluded Merrill Lynch from interpreting the Plan to ascertain the Change in Control date. Section 8.6 limits Merrill Lynch's exercises of discretion that "would have the effect of diminishing a Participant's rights," but that provision cannot reasonably be construed to divest the Committee of the right to determine how the Plan would be applied categorically before the merger took effect to ascertain, in the first instance, whether a Participant had rights.

As we have observed, our jurisprudence indicates that Young must show that "no honest tribunal could reach any other decision."[13] We note that in *Glickman v. Bank of America Corp.*, in an oral decision, a New York court considered the Change in Control date under § 8.3 and its effect on share valuation for employees who left the firm after the merger closed.[14] That tribunal concluded that an agreement that applied Merrill Lynch's theory of the interplay of §§ 8.2 and 8.3 was "consistent with the [P]lan."[15]

As Merrill Lynch's interpretation of the Plan was not arbitrary, its appeal regarding the date to be used for the pre-CIC Value is moot.

## III

The dissent would expand the range of situations in which this court will substitute its own judgment for that of an entity vested with sole authority under a contract, despite this court's explicit fear of "doing violence" to a sole authority provision in such a manner.[16] The dissent reads *Matthews* as "deferring to the board's discretionary interpretation only where the language

---

[13] *Matthews*, 465 F.2d at 821.

[14] *Glickman v. Bank of America Corp.*, No. 603651/09, at *17 (N.Y. Sup. Ct., N.Y. Cnty. Apr. 26, 2010).

[15] *Id.* at *20.

[16] *Matthews*, 465 F.2d at 820.

is 'so indefinite' and has 'an infinite number of meanings.'"[17] However, this court held in *Matthews* that the only situation in which we would substitute our own judgment for the board's is when observers would "necessarily conclude" that an interpretation adopted by an administrator was unsupported by a plan's terms.[18] As we stated, "In all other cases the discretion of the judge cannot be substituted for that of the Pension Board without departing from the terms of the contractual obligation."[19] Thus, we do not require a provision to have "infinite" meanings, but rather it need only have more than a single viable meaning, to vest the board with the discretion incumbent in the contractual provision.

Further, the dissent minimizes the effect of § 8.2 of the Plan by declaring it "purely definitional," and therefore without operative effect.[20] Yet, the term "Change in Control," as defined in § 8.2, goes to the crux of operative language elsewhere in the Plan.    Here, the parties stipulated that the merger's consummation in January 2009 "resulted in the occurrence of a 'Change in Control,' as described in Section 8.2" of the Plan.  There is room for reasonable disagreement about which of two potential Change of Control dates applies to those in Young's situation.

The dissent also raises a series of issues with this court's *Matthews* precedent and its relationship to New York's *Glickman v. Bank of America Corp.* The dissent begins by taking issue with *Matthews*' holding and the language therein requiring that a claimant demonstrate that "no honest tribunal could reach any other decision," questioning its foundation in New York law.[21]  But *Matthews* provides this court's interpretation of the New York test enunciated

---

[17] Dissent at *3.

[18] *Matthews*, 465 F.2d at 820-21.

[19] *Id.* at 821.

[20] Dissent at *6, 9.

[21] *Id.* at *11 (citing *Matthews*, 465 F.2d at 821).

in *Gitelson v. DuPont* that is applicable to the instant case.[22]  It is the *Matthews* test that we are bound to apply, since "the rule of orderliness forbids one of our panels from overruling a prior panel."[23]

Alternatively, the dissent contends that this court should not defer to the New York trial court in *Glickman* if we conclude that Merrill Lynch acted arbitrarily in interpreting the Plan.[24] This is—of course—correct: *Matthews* does not direct us to defer blindly to any court's decision supporting a particular reading of the Plan.  *Matthews* held that the burden was on the claimant to show "that no honest tribunal could reach any other decision and the burden of proving that any other decision is or would be arbitrary, fraudulent or in bad faith."[25]  Thus, if we conclude that a given interpretation is arbitrary, another court's contrary holding is not a bar to our action.  Instead, it is incumbent for us to distinguish those contrary decisions, either as a decision that an "honest tribunal could [not] reach" or as answering a discrete question.

The dissent, in fact, contends that *Glickman* is distinguishable from the instant case.[26]   But that case addressed the accuracy of Merrill Lynch's interpretation of the Change in Control date under the Plan.  Indeed, in *Glickman*, the court's belief that Merrill Lynch had correctly interpreted the Plan in applying Change in Control dates was, at the least, an alternative basis for its holding.  The court explicitly rejected the contention that the reading of the Plan advanced by Merrill Lynch in this case constituted a "change in the

---

[22] 465 F.2d at 819 (citing 215 N.E.2d 336 (N.Y. 1966)).

[23] *Teague v. City of Flower Mound, Tex.*,179 F.3d 377, 383 (5th Cir. 1999).

[24] Dissent at *11 (citing No. 603651/09, at *17 (N.Y. Sup. Ct., N.Y. Cnty. Apr. 26, 2010)).

[25] 465 F.2d at 821.

[26] Dissent at *11-12.

No. 10-20455

terms" of the Plan.[27]  It then issued its ruling that Merrill Lynch's valuation was "consistent with the [P]lan."[28]

*      *      *

We REVERSE and RENDER judgment for Merrill Lynch.

---

[27] *Glickman*, No. 603651/09, at *20.

[28] *Id.*

No. 10-20455

HAROLD R. DeMOSS, JR. dissenting:

This appeal involves the relationship between John Young's resignation from Merrill Lynch and Merrill Lynch's merger into Bank of America. The sole issue on appeal is whether the Merrill Lynch compensation committee's determination that Young did not have Good Reason to resign on February 26, 2009, was arbitrary under New York law. Whether Young had Good Reason to resign turns on whether the execution date of the merger agreement (September 15, 2008) is the applicable Change in Control date, or whether the consummation date of the merger agreement (January 1, 2009) or any other date is a possible alternative Change in Control date. If Young had Good Reason to resign on February 26, 2009, Merrill Lynch was required to pay to him the value of his unexercised Restricted Units pursuant to the terms of the Merrill Lynch Long-Term Incentive Compensation Plan (the Plan). If Young did not have Good Reason to resign on February 26, 2009, Merrill Lynch was not required to pay him anything upon his resignation.

Under the specific facts of this case and the unambiguous terms of the Plan, it is clear that Young had Good Reason to resign on February 26, 2009. The compensation committee's finding that Young did not have Good Reason to resign on February 26, 2009, was based on an interpretation of the Plan that was contrary to the unambiguous terms of the Plan and therefore arbitrary under New York law. Young is entitled to receive payment for the value of his unexercised Restricted Units as calculated under the Plan. I would affirm the magistrate judge's decision based on the reasoning provided by her thorough and well-reasoned memorandum and order. I therefore respectfully dissent.

## I.

Four specific dates are involved in this appeal, none of which are in dispute: (1) the execution date of the merger agreement on September 15, 2008; (2) the payment date of Young's reduced annual cash bonus in "late December 2008"; (3) the consummation date of the merger agreement on January 1, 2009;

and (4) Young's resignation date on February 26, 2009.

If Young's interpretation of the events in question is correct—*first*, the applicable Change in Control date occurred on September 15, 2008; *then* Young was given Good Reason to resign based on a reduced annual cash bonus paid in "late December 2008"; and *thereafter* Young resigned on February 26, 2009—Young is owed payment for his unexercised Restricted Units. On the other hand, if the compensation committee's interpretation of the events in question is a valid alternative under the terms of the Plan—*first* Young received a reduced annual cash bonus in "late December 2008"; *then* the applicable Change in Control date occurred on January 1, 2009; and *thereafter* Young resigned on February 26, 2009—Young is not owed payment because Good Reason to resign arose *after* the applicable Change in Control date.

Because the Plan gives "sole and complete authority" to the compensation committee to interpret the Plan, "[s]ubject to the provisions of the Plan," this court must defer to the committee's interpretation unless it is arbitrary under New York law. An interpretation is "arbitrary" if it lacks "any rational factual basis or was made without reference to relevant facts and contractual provisions." *Brooks v. Cohen & Steers, Inc.*, 817 N.Y.S.2d 235, 236 (N.Y. App. Div. 2006) (citing *Gehrhardt v. Gen. Motors Corp.*, 581 F.2d 7, 12 (2d Cir. 1978)). Where there was "no reasonable basis" in the terms of the Plan for the compensation committee's interpretation and decision, the interpretation was arbitrary. *Gehrhardt*, 581 F.2d at 11. This is a "heavy burden" for Young to carry, *id.*, but it does not authorize carte blanche deference for the compensation committee to completely misconstrue the clear and unambiguous relevant contract provisions.

The majority of this panel determined that the committee's construction of the Plan was not arbitrary. I disagree. Because the merger agreement's execution date on September 15, 2008, was the only applicable Change in Control date under the only reasonable reading of the Plan, Young had Good

No. 10-20455

Reason to resign beginning on that date and continuing through his resignation on February 26, 2009.

## II.

For purposes of this appeal, there are four relevant provisions of the Plan: Sections 8.1, 8.2, 8.3, and 8.5. The terms of each of these provisions are clear and unambiguous on their face and therefore binding on the parties. Under New York law and this circuit's precedent applying the same, this court will only defer to the compensation committee's interpretation of the Plan if there is some ambiguity or "indefinite" meaning in the terms of the relevant provisions. *See Matthews v. Swift & Co.*, 465 F.2d 814, 820-21 (5th Cir. 1972) (deferring to the board's discretionary interpretation only where the language is "so indefinite" and has "an infinite number of meanings"). Despite the compensation committee's and the majority's contrary assertions, there is no room for discretionary interpretations of any of these Plan provisions because there is no ambiguity to interpret.

## A.

Section 8.1 gives Young the right to resign for Good Reason after a Change in Control has occurred and receive payment for his unexercised Restricted Units. It also provides the calculation method for such payment. It provides, in relevant part, that:

> in the event a Change in Control shall occur and thereafter [Young] shall terminate his . . . employment with the Company for Good Reason, [Young] shall be paid the value of his . . . Restricted Units . . . in a lump sum in cash, promptly . . . . Payments shall be calculated as set forth below.

This provision clearly establishes the basic requirements for Young to receive payment for his unexercised Restricted Units: he must resign for Good Reason which arose *after* a Change in Control occurred. Section 8.1's language is

unambiguous and not subject to multiple interpretations.

Relatedly, Section 8.5 provides that "Good Reason" shall include the reduction of Young's annual cash bonus "below the . . . average annual cash bonus paid to [Young by Merrill Lynch] for the three years preceding the year in which the Change in Control occurs." Section 8.5's language is unambiguous and not subject to multiple interpretations. The parties do not dispute that the annual cash bonus Young received in "late December 2008" was lower than the average of his three preceding annual cash bonuses and would qualify as Good Reason to resign if it followed a Change in Control. They do dispute, however, the applicable Change in Control date.

## B.

Section 8.3 establishes the Change in Control date applicable to circumstances where an employee resigns for Good Reason. It reads in full:

> If [Merrill Lynch] executes an agreement, the consummation of which would result in the occurrence of a Change in Control as described in Section 8.2, then, with respect to a termination of employment without Cause or for Good Reason occurring after the execution of such agreement (and, if such agreement expires or is terminated prior to consummation, prior to such expiration or termination of such agreement), a Change in Control shall be deemed to have occurred as of the date of the execution of such agreement.

Like the other provisions in the Plan, Section 8.3's language is unambiguous and not subject to multiple interpretations. It exists only to accomplish two things. First, it provides that when a merger agreement is executed which would result in a Change in Control (as defined by Section 8.2), the execution date is the applicable Change in Control date for purposes of any subsequent resignations for Good Reason. And second, its parenthetical provides a narrow exception to the general rule, effectively revoking an employee's right to resign for Good Reason if such merger agreement expires or is terminated prior to its consummation. It controls the precise determination at issue in this appeal.

No. 10-20455

**C.**

Section 8.2 defines what types of corporate events qualify as a Change in Control under the Plan. It reads in full:

A "Change in Control" shall mean a change in control of [Merrill Lynch] of a nature that would be required to be reported in response to Item 6(a) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whether or not the Company is then subject to such reporting requirement; provided, however, that, without limitation, a Change in Control shall be deemed to have occurred if:

(a) any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, or any syndicate or group deemed to be a person under Section 14(d)(2) of the Exchange Act, other than the Company's employee stock ownership plan, is or becomes the "beneficial owner" (as defined in Rule 13d-3 of the General Rules and Regulations under the Exchange Act), directly or indirectly, of securities of [Merrill Lynch] representing 30% or more of the combined voting power of [Merrill Lynch's] then outstanding securities entitled to vote in the election of directors of [Merrill Lynch];

(b) during any period of two consecutive years (not including any period prior to the Effective Date of this Plan) individuals who at the beginning of such period constituted the Board of Directors and any new directors, whose election by the Board of Directors or nomination for election by the stockholders of [Merrill Lynch] was approved by a vote of at least three quarters of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof; or

(c) all or substantially all of the assets of [Merrill Lynch] are liquidated or distributed.

The compensation committee and the majority hang their hats on the idea that Section 8.2 provides for a Change in Control date for purposes of resignations for Good Reason other than the execution date. But Section 8.2 is a purely definitional provision and can have no operative effect. It can have no interplay with the other provisions of the Plan outside of indicating whether a certain

No. 10-20455

corporate event qualifies as a Change in Control.  It merely defines what types of agreements or other corporate actions will qualify as a Change in Control under the terms of the Plan.  It provides no Change in Control date or method to determine a date.  Section 8.2's language is unambiguous and not subject to multiple interpretations.

## III.

When the compensation committee denied Young's request for payment of the value of his unexercised Restricted Units following his resignation on February 26, 2009, it determined that no Good Reason existed on that date because Young's reduced annual cash bonus received in "late December 2008" was paid before the date it claimed was the applicable Change in Control date (January 1, 2009).  It made such determination based on its interpretation of the Plan that made Section 8.3 only applicable to situations where Good Reason for an employee's resignation arose *after* the execution date but *before* the consummation date.  It found that, pursuant to the purported interplay between Sections 8.2 and 8.3, the execution date (September 15, 2008) was no longer the applicable Change in Control date once the consummation date of the merger agreement (January 1, 2009) was known.  It held that, pursuant to Section 8.2, the consummation date was the applicable Change in Control date for purposes of Young's resignation for Good Reason.

On appeal, the majority holds that the compensation committee's interpretation of the Plan was not arbitrary under New York law.  It makes several arguments in support of its holding, none of which are persuasive.  First, it states that New York's arbitrariness standard of review is a "heavy burden" which Young did not carry.  *See Gehrhardt*, 581 F.2d at 11.  Second, it notes that Section 8.3 "deemed" the execution date as the applicable Change in Control date and states in effect that the Plan's use of a "deemed" Change in Control date was no longer necessary once the "actual" Change in Control date (i.e., the

consummation date) was known. And finally, it cites to an unpublished oral decision by a New York state trial judge in support of its contention that an "honest tribunal" already disagreed with Young's interpretation of the Plan, thereby showing that he fails to meet the high standard of review. *See Glickman v. Bank of Am. Corp.*, No. 603651/2009, at \*1 (N.Y. Sup. Ct., Apr. 26, 2010). In the end, the majority simply dismisses Young's interpretation of the Plan as "an alternative reading" of the Plan (purportedly one of many alternative interpretations and "scenarios") and concludes that it must defer to the compensation committee's interpretation.

I address each of the majority's arguments in turn, and further explain how the compensation committee's interpretation of the Plan is contrary to the unambiguous language of the Plan and to the parties' intent upon entering into the contract.

## A.

As to the majority's first argument, New York law's deferential standard of review—whether the compensation committee's interpretation was "arbitrary"—does not give this court a license to excuse the compensation committee's interpretation of the Plan when it is contrary to the unambiguous terms of the Plan. *See Gallo v. Madera*, 136 F.3d 326, 330-31 (2d Cir. 1998) (holding that the court does not defer to an interpretation that "impose[s] a standard not required by the plan's provisions, or interpret[s] the plan in a manner inconsistent with its plain words") (quoting *Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Emp. Pension Benefit Plan*, 698 F.2d 593, 599 (2d Cir. 1983)).

In reaching its result, the majority strains to find any possible Change in Control date other than the one expressly provided by Section 8.3. The Plan clearly provides in Section 8.3's parenthetical one narrow exception to Section 8.3's general rule that the execution date is the applicable Change in Control

date for purposes of Young's resignation for Good Reason.  The parenthetical explicitly revokes Young's right to resign for Good Reason when an agreement which would otherwise have resulted in a Change in Control "expires or is terminated prior to consummation."  The majority is correct that in such cases the Change in Control date is no longer deemed to be the execution date, but that is simply because the agreement would then be defunct and there would no longer be *any* possible Change in Control date under Section 8.3 or any other section of the agreement.

The Plan could have provided another exception that narrowed the time an employee had Good Reason to resign to the period between the execution date and the consummation date (as Merrill Lynch and the majority would like to have Section 8.3 be read), but it did not.  New York law does not permit the compensation committee to read nonexistent provisions into an otherwise unambiguous contract, and this court should not permit the committee's interpretation which is contrary to the plain terms of the Plan to stand under the guise of deferential review.  *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) ("A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.") (citations omitted).

Moreover, the parties have already stipulated that: (1) the merger agreement consummated on January 1, 2009, qualified as a Change in Control pursuant to the definition provided by Section 8.2; and (2) the merger agreement executed on September 15, 2008, qualified as "an agreement, the consummation of which would result in the occurrence of a Change in Control as described in Section 8.2," pursuant to the terms of Section 8.3.  This stipulation places the question of the applicable Change in Control date squarely within the parameters of Section 8.3 (based on the definition provided by Section 8.2).  Attempting to find alternative readings of the Plan by transforming the purely

definitional provision of Section 8.2 into an operational provision is plainly wrong under New York law's basic contract interpretation principles. *See id.* No deference is warranted in this case.

### B.

As to the majority's second argument, the fact that the execution date is "deemed" to be the applicable Change in Control date misses the point. The word "deem" is "traditionally considered to be a useful word when it is necessary to establish a legal fiction . . . by 'deeming' something to be what it is not." BLACK'S LAW DICTIONARY 478 (9th ed. 2009) (commentary). It is a frequently used drafting device in many private contracts; it is not in any way an ambiguous contractual term. By "deeming" the execution date to be the applicable Change in Control date for resignations for Good reason, the Plan simply acknowledges that other possible Change in Control dates may exist and may govern situations outside of Section 8.3. For instance, the Securities Exchange Act of 1934 (cited by Section 8.2) may consider the consummation date to be the applicable Change in Control date for securities reporting purposes. But this possibility has no effect on circumstances governed by Section 8.3.

The parties have a private right to contract, and they clearly chose the execution date to be the applicable Change in Control date with respect to Young's resignation for Good Reason. Of course it was unnecessary for the parties to pick that particular date, but they chose to do so and that is what Section 8.3 clearly provides. In its attempt to find an alternative reading hidden somewhere between the lines of the Plan, the majority states that "Young's construction of the Plan reads the actual date of the merger, which the parties have stipulated constituted a Change in Control, out of the Plan entirely in a merger situation." This statement is incorrect and demonstrates how the majority misunderstands the basic question on appeal. The consummation date of the merger (January 1, 2009) exists regardless of how Young or Merrill Lynch

reads the Plan. My point is simply that, other than closing the window left open by Section 8.3's parenthetical for situations where an agreement expires or is terminated prior to consummation, the consummation date has no effect on situations involving resignations for Good Reason. The fact that a consummation date exists does not change the reality that the parties expressly chose to use the execution date (not the consummation date) as the date on which a Change in Control occurred for purposes of Young's resignation for Good Reason.

Neither Merrill Lynch nor the majority can point to any language indicating that Section 8.3 ceases to govern resignations for Good Reason once the merger agreement involved is consummated. As such, the compensation committee's interpretation was arbitrary because it ignored the unambiguous terms of the Plan, and the majority not only excuses but blesses this wholly unreasonable interpretation.

## C.

As to the majority's third argument, it states that Young failed to meet both "the burden of proving . . . that no honest tribunal could reach any other decision and the burden of proving that any other decision is or would be arbitrary." *Matthews*, 465 F.2d at 821. To bolster its claim that an honest tribunal has already made a contrary decision, it cites to an unpublished oral decision by a New York state trial judge who was never asked to determine whether the compensation committee's interpretation of the terms of the Plan was arbitrary under New York law. *See Glickman*, No. 60365/2009, at *1.

There are three problems with the majority's reliance on *Glickman*. First, there is no indication that the "no honest tribunal" language actually derives from New York law. *Matthews* announced this additional "burden" to show "that no honest tribunal could reach any other decision" without providing any citation to New York law, and I have found no other case applying this standard. *See Matthews*, 465 F.2d at 821. This additional burden appears to be an anomaly

that does not tie back to New York law's long held and widely recognized "arbitrary" standard. *See Brooks*, 817 N.Y.S.2d at 236; *see also Gehrhardt*, 581 F.2d at 11; *McGory v. N.Y. State Teamsters Conference Pension & Ret. Fund*, 392 N.Y.S.2d 143, 144 (N.Y. App. Div. 1977). New York law's standard continues to be simply whether the committee's interpretation was "arbitrary" which is defined as lacking "any rational factual basis or [being] made without reference to relevant facts and contractual provisions." *Brooks*, 817 N.Y.S.2d at 236 (citing *Gehrhardt*, 581 F.2d at 12).

Second, even if the additional burden of proving that "no honest tribunal could reach any other decision" is based on New York law, it can hardly mean that the existence of one unpublished oral decision by a New York state trial judge requires this court to find an alternative interpretation of Section 8.3. Under the majority's reasoning, simply because the *Glickman* decision exists this court must defer to the compensation committee's interpretation even if it is contrary to the unambiguous terms of the Plan.

And third, *Glickman* is easily distinguishable from this case. The *Glickman* judge was asked to determine whether a separate termination agreement was valid for purposes of the precise valuation of unvested stock rights owed and already paid to two former employees. *Id.* at *3-5. The judge briefly "perused" Section 8.3 of the Plan to determine whether there was a conflict between the termination agreement and the Plan, but he never made a finding as to the precise construction of the terms of the Plan. *Id.* at *16-19. He never read or mentioned Section 8.2, and his review of Section 8.3 was cursory. *Id.* While he indicated that he "think[s] [Merrill Lynch] is right in [its] interpretation" of Section 8.3, he immediately stated that "more importantly, we have an agreement signed by [the employees] where they agree to the price [already paid]." *Id.* at *19-20. Ultimately, he never considered whether the compensation committee's interpretation of the Plan was arbitrary under New York law because that is not the question he was asked to decide. *Id.* at *20.

Based on all of these distinguishing factors, the majority's reliance on *Glickman* is misplaced.

**D.**

Finally, the compensation committee's interpretation of the Plan is contrary to the clear intent of the parties to the contract. The compensation committee's interpretation essentially renders meaningless Young's rights under Section 8.3 by severely restricting his window of time to make a resignation decision. *See Empire Props. Corp. v. Mfrs. Trust Co.,* 288 N.Y. 248-49 (1942) (stating that New York courts "read the writing as a whole [and] seek to give to each clause its intended purpose in the promotion of the primary and dominant purpose of the contract") (citations omitted). Because Young's reduced annual cash bonus was paid in "late December 2008," under the compensation committee's interpretation he had only several days to decide whether to resign before his right to resign for Good Reason expired. His only other option would be to work for Bank of America (a new and potentially unfavorable employer) for a full year and then determine based on his 2009 annual cash bonus whether he once again had Good Reason to resign (this time factoring in his already reduced 2008 bonus into the average annual cash bonus calculation). These results are not tied to the Plan's plain language and almost certainly are not what either party had in mind when they first contracted. *See Halsted v. Globe Indem. Co.,* 179 N.E. 376, 377-78 (N.Y. 1932) ("The intention of the parties must be sought for in the language used. To understand the language, we may put ourselves in their place and discern if possible the objects they had in view, and the motives which dictated their choice of words"). In contrast, Young's construction of the Plan is completely reasonable and tightly tethered to the text of the Plan.

In addition, using the execution date as the applicable Change in Control date is reasonable with respect to the valuation of the Restricted Units. Section 8.1 provides that the value of each Restricted Unit payable upon resignation for

No. 10-20455

Good Reason is the higher of (1) the fair market value of a share of Merrill Lynch common stock on the resignation date, or (2) the highest fair market value of a share of Merrill Lynch common stock on any day during the 90-day period ending on the date of the Change in Control. This valuation methodology clearly protects Young's right to receive the most value for his unexercised Restricted Units while also protecting him from any devaluation of his Restricted Units that may be caused by the signing of an agreement which would result in a Change in Control. Contrary to the plain language of Section 8.1 and its clear intention to protect the value of Young's Restricted Units whenever a Change in Control is contemplated by agreement, the compensation committee's use of the consummation date gives Merrill Lynch the benefit of the diminished value of its common stock. The highest total value of Young's Restricted Units during the 90 days prior to the execution date was $546,933.90; the value calculated by Merrill Lynch using the subsequent consummation date is $469,371.42. The Plan does not permit Merrill Lynch to take advantage of a decline in the value of its common stock (in this case by 14%) which occurred after the execution date. As such, the compensation committee's interpretation is both unreasonable and contrary to the unambiguous terms of the Plan.

## IV.

Ultimately, the terms of the Plan are unambiguous and Section 8.3 is directly controlling. It provides that the execution date of the merger agreement (September 15, 2008) shall be the applicable Change in Control date with respect to resignations for Good Reason. It carves out only one narrow exception to this general rule for situations where the agreement expires or is terminated prior to consummation and the potential for a Change in Control no longer exists. Neither Section 8.3 nor any other provision permits, expressly or implicitly, a different Change in Control date to govern resignations for Good Reason. This certainly includes situations where the agreement has already been

consummated. Any other interpretation is contrary to the Plan's plain language.

Because the Merrill Lynch compensation committee's interpretation lacked "any rational factual basis [and] was made without reference to relevant facts and contractual provisions," it was arbitrary under New York law. *Brooks*, 817 N.Y.S.2d at 236 (citing *Gehrhardt*, 581 F.2d at 12). If the majority would simply read the plain language of the Plan instead of straining to find some alternative interpretation hidden between the lines of Sections 8.2 and 8.3, it would come to the same conclusion. The applicable standard of review is not so deferential that this court must permit the compensation committee to completely disregard the unambiguous terms of the Plan and deny Young the payment he is owed. For purposes of Young's resignation for Good Reason, the Change in Control occurred before Young received his reduced annual cash bonus and before Young's resignation date. No Plan provision provides otherwise. Therefore, Good Reason did exist when Young resigned on February 26, 2009.

For the foregoing reasons, I would affirm.