**NOT RECOMMENDED FOR PUBLICATION**
File Name: 16a0561n.06

No. 16-3036

**FILED**
Oct 04, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JAMES J. CONNELLY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| STANDARD INSURANCE COMPANY, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |
| | ) | |

BEFORE:     SUTTON and STRANCH, Circuit Judges; STEEH, District Judge.[*]

**JANE B. STRANCH, Circuit Judge.**     James Connelly sued Standard Insurance Company for its denial of long-term disability benefits under an employee welfare benefit plan sponsored by his former employer. The district court granted summary judgment to Standard. The parties dispute whether Connelly met the plan's definition of disability before his coverage ended in July 2011. After reviewing the administrative record, we agree with the district court that Standard's denial was not arbitrary and capricious, and thus AFFIRM.

## I.     FACTS

Connelly has suffered from multiple chronic illnesses for many years. Connelly was diagnosed with Crohn's disease in 1990 and has received regular treatment and two bowel

---

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

resections. Crohn's is a chronic, incurable disease with episodic symptoms; flare-ups can cause abdominal pain, nausea, diarrhea, and incontinence. Over the years Connelly has also been diagnosed with diabetes, hypertension, acid reflux disease, gall bladder disease, degenerative herniated disk disease, arthritis, anemia, depression, and anxiety.

Connelly worked as a staff attorney for Community Legal Aid Services ("CLAS") in Ohio from 1998 through 2011. In April 2011, Connelly's mother became seriously ill, and Connelly stated that this led him to experience untreated depression, which coincided with worsening of his Crohn's symptoms. He stated that he began to miss work to care for her and for himself in the months leading to the loss of his job. CLAS terminated Connelly's employment on July 26, 2011 for reasons that are not clear from the record. Since December 2011, Connelly has worked part-time as a delivery person for his sister's flower shop.

At CLAS, Connelly participated in an employee benefit welfare plan, insured and administrated by Standard, which provided long-term disability benefits to plan participants who become disabled according to the plan's definition during their employment. Connelly's coverage ended July 26, 2011, the date his job ended. On September 17, 2012, Connelly sought disability benefits from Standard, claiming that he became unable to work at his occupation as a result of disability on July 25, 2011, and listing all the conditions noted above as contributing illnesses.

As support for his claim, Connelly submitted medical records, doctors' notes, and statements from his two long-term doctors: Dr. Carlos Ricotti, a gastroenterologist, and Dr. Zulfikar Mangalji, an internist. In March and April 2011, following constipation and abdominal pain, Connelly underwent a CT scan, which found mild bowel wall thickening without significant inflammation or obstruction, and a colonoscopy, which found nothing abnormal. Dr.

Ricotti prescribed Entocort, a drug for mild to moderate Crohn's disease, instructing Connelly to stop taking it in April. Connelly next saw Dr. Ricotti on August 12, when Dr. Ricotti prescribed Pentasa, another drug for mild to moderate Crohn's, and noted Connelly's statement that "I lost my job."

Notes from Connelly's meetings with Dr. Mangalji in 2011 primarily concerned routine monitoring of weight, blood sugars, and blood pressure for diabetes and hypertension. Dr. Mangalji's notes from July 12, 2011 included nothing unusual and discussed neither Crohn's disease nor Connelly's job. On August 16, Dr. Mangalji noted that Connelly "was fired from job" and was "on Pentasa."

In September 2012, Dr. Ricotti and Dr. Mangalji each submitted statements to Standard in support of Connelly's claim for disability benefits. Both doctors stated that they recommended in July 2011 that Connelly should stop working. Dr. Ricotti wrote that he made such a recommendation due to a "fullblown flareup" of Crohn's, causing diarrhea, pain, nausea, and depression affecting Connelly's ability to perform his responsibilities as an attorney. Dr. Mangalji attributed his recommendation to an "acute exacerbation" of Crohn's causing pain, diarrhea, nausea, anemia, and depression, preventing Connelly from performing his work responsibilities.

Standard consulted two physicians as part of its review of Connelly's claim and his medical records. Neither physician found evidence that Connelly's ability to work was impaired as of July 26, 2011. Dr. Steven Beeson found that Connelly's Crohn's was treated conservatively and that he saw doctors relatively infrequently, indicating that his Crohn's was not so severe as to prevent him from working. Dr. Oded Shulsinger found no evidence of work impairment in 2011, though he did note an acute exacerbation of Connelly's Crohn's disease in

March 2012, as discussed below. Both physicians found that Connelly's diabetes was controlled and that his other conditions did not create work limitations during 2011.

The parties do not dispute that Connelly's Crohn's disease worsened after his employment with CLAS ended. In May 2012, Connelly described a Crohn's flare-up lasting the prior six to seven months, accompanied by increased depression and anxiety. Dr. Mangalji diagnosed Connelly with anemia in February 2012, and Connelly was hospitalized from May 25 to 27 for an acute small bowel obstruction. In July 2012, Dr. Mangalji noted that Connelly was "moderately depressed" and prescribed Prozac.

Connelly received approval for Social Security disability benefits in 2012. Although Connelly sought a disability onset date of July 26, 2011, the Social Security Administration ("SSA") found evidence only of disability beginning on February 17, 2012. The SSA undertook a physical exam and a psychological exam of Connelly in 2012, both of which were reviewed by Standard's two consulting physicians, as well as an additional consulting psychiatrist.

Standard first denied Connelly's claim in January 2013, finding no evidence of work limitations prior to February 2012. Connelly administratively appealed and Standard upheld its denial. Standard then offered Connelly the opportunity to provide Dr. Ricotti's notes, which Connelly provided. Standard had Dr. Beeson review these notes, and upheld its denial again.

Connelly sued under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B). Standard and Connelly filed cross-motions for judgment on the administrative record. The district court granted Standard's motion and denied Connelly's. Connelly timely appealed.

## II.     ANALYSIS

We review de novo the district court's judgment on Connelly's ERISA claim. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps*, 741 F.3d 686, 700 (6th Cir. 2014). As the parties agree, we must determine whether Standard's denial of benefits was arbitrary and capricious. *Haus v. Bechtel Jacobs Co., LLC*, 491 F.3d 557, 561 (6th Cir. 2007) (applying arbitrary and capricious standard to plans granting administrators discretionary authority) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). A denial of benefits is not arbitrary and capricious "if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998).

Standard's denial of Connelly's claim was based on substantial evidence that Connelly did not become unable to work until after his coverage ended in July 2011. The medical records contemporaneous with the loss of Connelly's job did not indicate a Crohn's flare-up or other conditions suggesting inability to work. His CT scan and colonoscopy in April 2011 raised no significant concerns. Although Connelly was prescribed Entocort in March, he was instructed to stop taking it in April, and he was not prescribed Pentasa until August, suggesting that Connelly was not being treated for severe Crohn's disease in July. Neither Dr. Ricotti nor Dr. Mangalji recorded in 2011 recommending that Connelly stop working, and Dr. Mangalji's notes from July 12, 2011 discuss neither Crohn's nor Connelly's work, instead reflecting only routine monitoring. Connelly concedes that there is little evidence of Crohn's disease in the administrative record between March and July 2011.

The SSA agreed with Standard that Connelly's disability began in 2012. Although Connelly is correct that the SSA and Standard's definitions of disability differ, the SSA's finding

still weighs in favor of the reasonableness of Standard's denial. *See Fura v. Fed. Express Corp. Long Term Disability Plan*, 534 F. App'x 340, 342 (6th Cir. 2013) ("whether the administrator considered any disability finding by the Social Security Administration" is a factor guiding the court's decision) (citing *Bennett v. Kember Nat'l Servs., Inc.*, 514 F.3d 547, 552-53 (6th Cir. 2008)).

Standard's denial also resulted from a principled decision making process. Standard consulted three physicians, including a psychiatrist, who each conducted an independent review of Connelly's medical records and claims. The letter of denial thoroughly documented the evidence in the record, explained the bases for Standard's decision, and notified Connelly of his opportunities to appeal, including the deadline for seeking initial review. Standard permitted submission of additional documents and consulted physicians again to consider the evidence in light of these new documents.

Connelly's strongest pieces of evidence are the letters that his physicians, Dr. Ricotti and Dr. Mangalji, each submitted stating their recommendations that Connelly stop working in July 2011 due to an acute flare-up of Crohn's and accompanying depression. As these two statements are from treating physicians and corroborate each other, they cannot be dismissed lightly. *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006) ("[A] plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion."); *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 170 (6th Cir. 2007) ("[T]he failure of the independent-review physicians . . . to explain why they had disregarded the opinions of the doctors who had in fact treated [the disability plan participant] was arbitrary.").

Standard's denial letter acknowledged both doctors' statements and explained how the medical records contemporaneous with Connelly's coverage did not support their conclusions.

The physicians consulted by Standard acknowledged Dr. Mangalji's statement and explained why their review of the medical records led them to different conclusions. Although the reviewing physicians did not acknowledge Dr. Ricotti's statement, it was substantively identical to Dr. Mangalji's statement. Most importantly, Standard and the physicians it consulted relied on substantial medical evidence—including the records from Connelly's treating physicians—to explain why they found no disability during the relevant time period, rather than ignoring such evidence as was done in benefit denials that we have found to be arbitrary and capricious. *See, e.g.*, *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005) (reviewing physician did not mention surgical reports, x-rays, or CT scans that were in the record); *Fura*, 534 F. App'x at 343 (reviewing physicians failed to address documented symptoms); *Elliott*, 473 F.3d at 620 (administrator gave greater weight to non-treating physician for "no apparent reason").

This case differs from those assessing whether a claimant is currently disabled, such as an appeal from the termination of prior benefits. In this case, the only question is whether Connelly was disabled before coverage ended in July 2011. The two statements of Connelly's treating physicians recalling his condition were recorded over a year after coverage ended. The key records here are those closely preceding the July 2011 time in question. But the records contemporaneous to that July 2011 time frame, as noted above, provide little or no support for the claim that Connelly was being treated for severe Crohn's disease flare-ups. Connelly's argument that he was diagnosed with chronic, incurable diseases during the coverage period, while clearly relevant, is not determinative of whether those conditions prevented Connelly from working before coverage ended, and does not undermine the specific records of Connelly's symptoms and treatment. He had long been diagnosed with several chronic diseases. With such

little competing contemporaneous evidence, it was not arbitrary for Standard to credit the contemporaneously created medical records over the after-the-fact statements.

Connelly argues that it was inappropriate for Standard to conduct a file review rather than conduct a physical exam, or at least speak with Connelly's treating physicians. Speaking with Connelly's doctors might have helped explain the discrepancy between their 2012 statements and their 2011 notes, but this factor by itself is not enough to find Standard's denial arbitrary and capricious. As for physical exams, an administrator's failure to conduct a physical exam can indeed weigh in favor of finding that a denial of benefits was arbitrary and capricious. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006). However, failure to conduct a physical exam is more relevant when determining whether a claimant is currently disabled. In *Evans* and the four cases it discusses, all of which held benefits denials without physical examinations to be arbitrary and capricious, the claimants were appealing *terminations* of benefits, and thus their current condition upon termination was highly relevant. *Id.* at 877-80 (discussing, among others, two cases cited by Connelly: *Calvert*, 409 F.3d at 296; and *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.*, 419 F.3d 501, 508 (6th Cir. 2005)). A physical exam would have been less helpful to determine whether Connelly was disabled during his coverage period, as Connelly did not file his claim until over a year after his coverage ended, and all parties agree that his condition worsened in the interim.

In some cases, however, a claimant's condition after coverage ends may provide evidence of conditions preexisting the end of coverage, such as when a condition that develops progressively exists during the coverage period but does not fully appear until afterwards. *See, e.g.*, *Rochow v. Life Ins. Co. of N. Am.*, 482 F.3d 860, 862-63, 866 (6th Cir. 2007) (finding it arbitrary and capricious to deny benefits to claimant with disease causing slow-onset brain

trauma that did not fully exhibit and was not diagnosed until two months after losing his job and coverage, when contemporaneous medical notes documented his cognitive degeneration over the prior year).[1] In this case, Connelly makes a conclusory argument on reply that his conditions are progressive, but has presented no evidence that the subsequent worsening of his condition was indicative of disability existing during the time of his coverage. Connelly told the SSA that the flare-up leading to his 2012 exacerbation began in October 2011 at the earliest, after the end of his coverage. Connelly himself states that his 2012 condition was irrelevant to his 2011 condition.

Connelly also argues that this case is similar to *DeLisle v. Sun Life Assurance Co. of Canada*, in which this court found a denial of benefits to be arbitrary and capricious. 558 F.3d 440 (6th Cir. 2009). As in this case, the *DeLisle* claimant sought benefits eight months after losing her job, the administrator relied on consulting physicians to review medical records rather than conducting a physical exam, and the treating physicians' after-the-fact statements about the claimant's disability were more strongly worded than their contemporaneous notes. *Id.* at 443, 444, 447. Several factors distinguish *DeLisle*. First, the claimant had been in two car crashes resulting in head and spine injuries and doctors identified the "progressive nature" of her medical conditions, such that less severe symptoms before coverage ended may have been indicative of more severe disability manifesting later. *Id.* at 447-48. Second, the SSA found the *DeLisle* claimant totally disabled as of the last day of her work and coverage; while the administrator disagreed with the SSA's findings in *DeLisle*, Standard followed the SSA here. *Id.* at 445-46. Third, one treating physician in *DeLisle* had recommended that the claimant cut back on work

---

[1]*Rochow* also held that presence at work is not determinative of disability. 482 F.3d at 865. Connelly correctly argues that his presence at work in July 2011 would not be a proper basis for denial of his disability claim. Standard's denial, however, was based not on Connelly's presence at work, but on the lack of medical records indicating inability to work in 2011.

four months before she ended her job; there is no contemporaneous evidence of Connelly's doctors making any recommendations about work before 2012. *Id.* at 447.

Fourth, the *DeLisle* claimant presented more than conclusory allegations of bias in the consulting physicians' reviews due to the administrator's conflict of interest. *Id.* at 445. When a plan administrator is also the plan insurer, and thus both evaluates and pays benefit claims, there is a conflict of interest. *Id.* (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112-15 (2008)). That conflict must be weighed as a factor in the court's determination. *Kalish*, 419 F.3d at 506 (citing *Bruch*, 489 U.S. at 115). Administrators with conflicts of interest have an incentive to contract with consulting physicians inclined to find no disability, and physicians may have an incentive to find no disability to preserve their consulting arrangements. *DeLisle*, 558 F.3d at 445 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003), and *Kalish*, 419 F.3d at 507). Standard concedes that it is a dual administrator-insurer, but it disputes that it was influenced by any conflict of interest. Unlike in *DeLisle*, where the claimant presented evidence that most of the consulting physicians had regular contracts with the administrator and that the administrator provided the physicians with incomplete or distorted information, *id.*, Connelly has presented no evidence of bias beyond conclusory allegations. In the district court, Connelly did request discovery on Standard's conflict of interest. Without more than conjecture, however, such as some allegation of procedural irregularity or provision of distorted information, the district court did not abuse its discretion in denying Connelly's discovery request. *Likas v. Life Ins. Co. of N. Am.*, 222 F. App'x 481, 486 (6th Cir. 2007). Given this lack of evidence regarding a conflict, the substantial evidence on which Standard and its consulting physicians based their conclusions, and the independent agreement of the SSA, Standard's conflict of interest does not appear to have played a role here.

Finally, Connelly argues that Standard refused to recognize the comorbid nature of his disability. Holistic evaluation of the integrated and cumulative nature of claimants' multiple physical and mental ailments can indeed help administrators more accurately determine claimants' ability to work. *See Kalish*, 419 F.3d at 510 (questioning consulting physician's failure to discuss interrelated effects of heart condition and depression); *Javery*, 741 F.3d at 702 (medical evidence established that claimant was unable to work "due to a combination of his physical and mental conditions"). Connelly's treating physicians noted in their 2012 statements that his Crohn's disease contributed to his depression, which was further compounded by his other chronic ailments. Although Standard and its consulting physicians acknowledged all of Connelly's conditions, they recorded no analysis of the potential interaction among them. In this case, however, Standard had little to work with—only Connelly's self-report and his doctors' brief, after-the-fact statements mention the interaction between his emotional and physical symptoms. Connelly's doctors provided no detail, and there are no medical records indicating mental illness in 2011. Even when examined with comorbidity in mind, the contemporaneous medical records do not indicate that a combination of physical and mental conditions prevented Connelly from working in July 2011.

## III.    CONCLUSION

This court recognizes the challenges Connelly has long faced due to his illnesses, as well as his current disability as determined by the SSA. Nonetheless, Standard's denial of benefits was not arbitrary and capricious given the evidence in the administrative record regarding Connelly's condition before his coverage ended. The grant of summary judgment to Standard is AFFIRMED.