NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0363n.06

No. 13-4282

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 14, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SAMUEL NISWONGER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PNC BANK CORP. AND AFFILIATES LONG | ) | |
| TERM DISABILITY PLAN, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Defendant, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| and | ) | |
| | ) | |
| LIBERTY LIFE ASSURANCE COMPANY OF | ) | |
| BOSTON, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

**BEFORE: DAUGHTREY, McKEAGUE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Samuel Niswonger appeals from the district court's order upholding Liberty Life Assurance Company of Boston's (Liberty) denial of his claim for long-term "any occupation" disability benefits. Because we conclude Liberty arbitrarily and capriciously denied Niswonger's claim, we **VACATE** and **REMAND**.

**I.**

Niswonger was employed as a financial advisor with PNC Financial Services Group, Inc. (PNC) until January 19, 2010, when he stopped working due to anxiety and shortness of breath. He filed a claim for disability benefits under PNC's group disability insurance plan with Liberty.

Under PNC's long-term disability plan, an employee becomes eligible for long-term disability benefits upon proof of continued (1) disability, (2) regular attendance of a physician, and (3) appropriate available treatment. Only the disability requirement is disputed here.

The plan provides long-term disability benefits for an initial period of eighteen months if the claimant is disabled as a result of an injury or sickness and is unable to perform the material and substantial duties of his own occupation, and continued benefits if the person is unable to perform, with reasonable continuity, the material and substantial duties of any occupation. "Own occupation" means "the Covered Person's occupation that he was performing when his Disability or Partial Disability began." The plan defines "any occupation" as "any occupation the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." Liberty is both the issuer of the plan and its administrator.

Liberty denied Niswonger's claim for "own occupation" benefits, and after an internal appeal, upheld the denial on October 1, 2010. Niswonger then brought an action in the district court under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B). Reviewing the "quantity and quality of the medical evidence" in the administrative record, the district court found that Liberty's denial of "own occupation" benefits was arbitrary and capricious. *Niswonger v. PNC Bank Corp. & Affiliates Long Term Disability Plan* (*Niswonger I*), No. 3:10-cv-377, 2011 WL 3360262, at *2, 10 (S.D. Ohio Aug. 3, 2011). The district court determined that the "evidence in the record overwhelming[ly] establishes Plaintiff's inability to do his job." *Id.* Liberty did not appeal that determination and paid Niswonger "own occupation" benefits for eighteen months, through October 20, 2011.

Liberty then began to assess Niswonger's eligibility for "any occupation" benefits. As part of its review, Liberty obtained a peer review of Niswonger's file by a physician board certified in internal medicine and pulmonary medicine. The reviewer, Dr. Wager, noted that Niswonger had restrictive lung disease, among many other supported medical diagnoses, but also concluded that a specific diagnosis was unclear and that "Niswonger could be impaired from a heretofore undiagnosed medical condition causing these [breathing/choking] episodes, but there is no medical evidence for such impairment in the current file."

Dr. Wager concluded:

> The claimant appears able to exert up to ten pounds of force occasionally, sit for long periods, and stand or walk for brief periods of time on a full time basis. He could have physical capacity slightly above this sedentary level, but assessing that would require cardio-pulmonary exercise testing, if necessary. These restrictions and limitations are due to cardiac disease and likely restrictive lung disease . . . and are likely to be permanent.

Liberty also conducted a vocational analysis using Dr. Wager's conclusions. The analysis found that "Niswonger would be able to perform the essential functions of his own occupation," and also determined that he had the ability to perform the occupations of Financial Sales Manager, Insurance Officer Manager, and Insurance Sales Agent.

Based on the information in the file, including Dr. Wager's review and the vocational analysis, Liberty denied Niswonger's claim for "any occupation" benefits. Liberty's February 15, 2012 denial letter stated: "[T]here is insufficient evidence to establish or substantiate that Mr. Niswonger is physically or psychologically impaired from performing, with reasonable continuity, the material and substantial duties of the above occupations based on his capacity and skill level."

Niswonger filed an appeal with Liberty on August 10, 2012. His appeal included over 375 pages of updated medical records, including the report from a CT scan performed in April 2012 that revealed "[s]mall groundglass opacities at both lung bases creating a mosaic attenuation pattern of the lung parenchyma or new since the previous CT scan [from August 18, 2009]." The report added, "Mild interstitial pulmonary edema or infectious inflammatory interstitial pneumonitis is in the differential diagnosis."

The updated medical records include a blood test ordered by Dr. Wagshul, a board-certified pulmonologist. The test found that Niswonger had mycoplasma pneumoniae and chlamydia pneumonaie.[1] Dr. Wagshul also ordered a pulmonary function test (PFT), which indicated that Niswonger had a "[s]evere airway obstruction." In particular, the test found that Niswonger's forced expiratory volume (FEV) was 32% of his predicted normal value. After given a bronchodilator, his FEV improved to 43%. Niswonger's total lung capacity (TLC) was 89% predicted normal value. The report noted that Niswonger's "effort was fair but inconsistent" because a "severe cough made it hard to perform some maneuvers." A PET scan revealed that Niswonger had a 5.0 mm nodule in his right mid-lung.

Dr. Wagshul provided a sworn statement to Niswonger's counsel, stating that he diagnosed Niswonger with, among many things, bronchitis and severe obstructive lung disease. He concluded that Niswonger was "not able to perform any occupation from the time he got sick to even at the present right now." Dr. Wagshul also acknowledged that Niswonger produced the best results on the PFT, and stated he did not doubt the test's veracity.

Liberty obtained "an independent review of all of the medical information contained in [Niswonger's] claim file." Dr. Brown, a board-certified physician in internal medicine with a

---

[1] Chlamydia pneumonaie is a respiratory bacteria found in the air.

sub-specialty in pulmonary disease conducted the review. Dr. Brown found that Niswonger "has no physical impairment," and concluded that he had "sustained full time capacity from 10/20/11 forward." Dr. Brown recalled Niswonger's medical history, which included chronic obstructive pulmonary disorder (COPD), and three PFT results. He opined that the "pulmonary function test data are not useful" because there was no data to explain the change in the reported TLC from the first test done in 2008 to the third test in 2012. He also reasoned that he could not "meaningful[ly] interpret[]" the 2012 test because Niswonger was coughing severely, and although he did not "have access to the raw PFT data for review," he thought Niswonger's performances on all the three tests were "not satisfactory."

In a letter dated October 18, 2012, Liberty denied Niswonger's claim for "any occupation" benefits. Relying on Dr. Brown's findings, Liberty concluded: "Based on our review, the totality of information on file does not support Mr. Niswonger's inability to perform the material and substantial duties of the occupations outlined in the letter of February 15, 2012."

Niswonger filed another ERISA action in the district court. The court upheld Liberty's denial of "any occupation" benefits, concluding that Liberty's decision "was the result of a deliberate, principled reasoning processing and is supported by substantial evidence." *Niswonger v. Liberty Life Assurance Co. of Bos.* (*Niswonger II*), No. 3:12-cv-374, 2013 WL 5566661, at *21 (S.D. Ohio Oct. 9, 2013). Niswonger now appeals.

## II.

In a benefits-denial action under ERISA, we review de novo a district court's decision to grant or deny a motion for judgment on the administrative record. *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005). However, where, as here, the plan vests the plan administrator with discretion over benefits-eligibility determinations, we review the administrator's denial of benefits to determine whether the denial is arbitrary and capricious. *Id.*;

*Glenn v. MetLife*, 461 F.3d 660, 665 (6th Cir. 2006), *aff'd*, 554 U.S. 105 (2008). Under the deferential arbitrary-and-capricious standard, we review "the quality and quantity of the medical evidence and the opinions on both sides of the issues," *Glenn*, 461 F.3d at 666 (internal quotation marks omitted), and will uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and supported by substantial evidence," *DeLisle v. Sun Life Assurance Co. of Can.*, 558 F.3d 440, 444 (6th Cir. 2009).

Generally, an administrator does not act arbitrarily if it chooses to rely on the medical opinion of one doctor over another. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) (citing *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003)). However, an "administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician." *Id.*; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). In addition, a plan administrator's decision to conduct a file review rather than a physical examination of the claimant weighs in the court's review of the decision to deny benefits. *Evans*, 434 F.3d at 877 (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005)). Reliance on a file review may be inadequate where the reviewer makes credibility determinations. *Calvert*, 409 F.3d at 297 & n.6. Whether a doctor has physically examined the claimant is another factor the court considers in determining whether the administrator acted arbitrarily and capriciously in giving greater weight to its consulting physician's opinion. *Kalish*, 419 F.3d at 508.

### III.

Niswonger concedes he does not have a disability caused by a cardiac or neurological condition. Rather, he argues that his disability stems from a pulmonary condition. He cites Dr.

Wagshul's clinical findings and other objective data as support.  Thus, Liberty's discussion of these other illnesses is not helpful.

After reviewing Niswonger's medical history, performing a physical examination, and ordering several tests, Dr. Wagshul diagnosed Niswonger with severe obstructive lung disease and atypical acute and chronic bronchitis.  In his sworn statement, he stated that objective data supported his diagnoses, including results of the 2012 PFT, blood tests, CT scan, and PET scan.  Neither Liberty's denial letter nor Dr. Brown's paper review rebuts Dr. Wagshul's findings.

Dr. Brown noted he reviewed Dr. Wagshul's statement, the lab reports, the three PFTs, and the CT and PET scans.  He noted that the CT scan "showed small ground glass opacities at the bases [of Niswonger's lungs]."  But he did not discuss the blood test's finding of mycoplasma pneumoniae and chlamydia pneumonaie.  Nor did he acknowledge the PET scan's results showing that Niswonger had a small nodule in his right mid-lung.  In addition, he reduced Dr. Wagshul's findings to the following sentence: "Dr. F Wagshul (6/4/12) noted a normal respiratory examination but also noted 'restrictive lung disease' in spite of the PFT (pulmonary function test) result that the claimant's total lung capacity (TLC) was 89% predicted, which is within the range of normal."  Dr. Brown's review failed to acknowledge that Dr. Wagshul also diagnosed Niswonger with "severe obstructive lung disease," which was consistent with the PFT's FEV result of 32% predicted, Dr. Sood's diagnosis two years earlier of the same disease, and the district court's finding in *Niswonger I* that the record contained "verifiable objective results including a diagnosis of obstructive lung disease."  *Niswonger I*, 2011 WL 3360262, at *8.

Dr. Brown dismissed the PFT results as "not useful."  He concluded that Niswonger "could not possibly have had the normal cardiopulmonary test results [in 2010] if he had a TLC

of 51% predicted [in 2008]." Assuming this is correct, it does not follow that all the PFTs are invalid. Dr. Brown opined that the 2012 FEV result, but not its TLC result, was invalid because Niswonger's performance on the test was "clear[ly] . . . not satisfactory," although he admitted he did not have access to the raw data. These conclusions contradict Dr. Wagshul's statements that Niswonger produced the best results and could not control his episodic coughs and the tester's comment that Niswonger's effort was "fair."

In short, despite Dr. Sood's and Dr. Wagshul's diagnoses of obstructive lung disease and Niswonger's history of COPD, Dr. Brown reported no pulmonary diagnosis other than "very minimal obstructive sleep apnea." He provided no explanation for his apparent disagreement with two board-certified pulmonologists, both of whom treated Niswonger.[2]

Liberty's denial of Niswonger's disability claim is not supported by substantial evidence. As the court in *Niswonger I* held, the record contains "verifiable objective results including a diagnosis of obstructive lung disease." 2011 WL 3360262, at *8. Although no evidence in the record indicates the disease was cured after October 20, 2011, Liberty concluded that Niswonger had attained full-time capacity from that date forward, including ability to perform his own occupation. Relying exclusively on Dr. Brown's paper review, Liberty effectively disregarded

---

[2] Dr. Brown's conclusion also conflicts with findings of Liberty's earlier consultant, Dr. Wager. Dr. Wager found that the record supported a diagnosis of restrictive lung disease. Dr. Wager opined that Niswonger's restriction to sedentary work was likely due to lung disease and that the restriction was likely permanent. Although Dr. Wager concluded that Niswonger had limited capacity for full-time work, Dr. Brown concluded otherwise, finding that Niswonger had "sustained full time capacity." Dr. Brown did not attempt to rationalize the inconsistency between his review and Dr. Wager's. Moreover, although Dr. Wager concluded that assessing whether Niswonger had "physical capacity slightly above [a] sedentary level . . . would require cardio-pulmonary exercise testing," Liberty did not request additional testing.

reliable medical evidence, including objective test results and the medical conclusions of Niswonger's treating physicians.

The district court reasoned that Liberty properly disregarded Dr. Wagshul's clinical findings because Dr. Wagshul offered only a preliminary diagnosis after three visits with Niswonger, admitted there was no data to explain the difference between Niswonger's 2010 and 2012 PFTs, and provided only generalized opinions about persons with Niswonger's condition. *Niswonger II*, 2013 WL 5566661, at *17. These reasons are unsupported by the administrative record.

First, in his statement submitted to Liberty, Dr. Wagshul does not question the accuracy of his diagnoses. Rather, he states that "it's too early to tell" what the "causative etiologies" are for the illnesses. He opines that infection is the root of Niswonger's condition and suggests that three months of treatment would not be enough time "to prove infection" as the source. He states that Niswonger has a chronic condition that "is not under control yet and he's severely debilitated from it." In addition, Dr. Wagshul cites objective data to support his diagnoses.

Second, although it is true that Dr. Wagshul concludes that "there is [not] enough data to determine anything," the context of the statement suggests that he meant that there was insufficient data to determine whether the 2010 and 2012 PFT results were invalid.[3] Again, Dr. Wagshul did not equivocate about his diagnoses.

---

[3] The relevant exchange with Niswonger's counsel reads:

> Q. Should we read anything into that that perhaps his testing with you is invalid or his testing with Dr. Soo[d] was invalid?
> A. No.
> Q. Is there enough data there to determine anything?
> A. No.

Third, Dr. Wagshul went beyond generalized opinions and gave opinions specific to Niswonger's ability to work.  For instance, Dr. Wagshul stated:  "It's my opinion he's not able to perform any occupation from the time he got sick to even at the present right now."  After reviewing the vocational analysis, counsel asked Dr. Wagshul: "Do you think that Sam could perform any of those occupations that are outlined there in this transferrable skills analysis?"  Dr. Wagshul responded: "Not right now.  Huh-uh, there is no way."  He also stated: "I couldn't literally hire him to answer phones.  Forget about doing billing or to write letters, no, he can't do that."  Counsel asked:  "Do you think that Sam would have the ability to communicate effectively with you all day long if he needed to?"  Dr. Wagshul replied:

> He could periodically, but often we see that if these folks are chronically afflicted with this, as we see every day, they are incapable of hour to hour to hour to hour to have consistent intellectual focus, consistent energy levels that for the most part that don't wax and wane and they are unable to do any functional work.
>
> They often develop what's even been referred to as brain fog at times where they don't think clearly at all.  So while they may not look ill, much like patients with fibromyalgia who don't look like they are in pain or patients with chronic fatigue syndrome who don't really look tired, these folks like Sam, they don't function normally at all, ever.

Taking into consideration Liberty's arbitrary disregard of reliable evidence, including objective medical tests and the opinions of Niswonger's treating physicians, its failure to satisfactorily rebut the medical evidence, and its decision not to request an independent examination or additional PFT, we conclude Liberty's denial was arbitrary and capricious.

## IV.

For these reasons, we **VACATE** the district court's judgment and **REMAND** with directions to order Liberty to reexamine Niswonger's claim in light of the full record.

**McKEAGUE, Circuit Judge, DISSENTING.** I respectfully dissent because the record provides clear support for concluding that Niswonger did not prove an impairment rendering him disabled within the meaning of the plan. The majority of Niswonger's treating physicians were unable to diagnose Niswonger's symptoms, despite aggressive investigation and, as Dr. Ginn told Dr. Wager, without a definitive etiology, an opinion could not be provided as to Niswonger's capacity for work. (*See* R. 12, Page ID # 442.)

Niswonger argues that because Dr. Wagshul diagnosed Niswonger with a pulmonary condition, Liberty should have ignored the inconclusive results of his other specialists. There are three problems with this argument: First, Dr. Wagshul admitted his diagnosis was preliminary. Dr. Wagshul only met Niswonger three times and, when asked if he was "clinically satisfied" with his diagnosis, Dr. Wagshul understandably explained, "Not yet. We are not three months into it." (*Id.* at Page ID # 351–352.) Second, Dr. Wagshul admitted his pulmonary function data conflicted with Dr. Sood's and when asked if there was enough "data there to determine anything," Dr. Wagshul responded there was not. (*Id.* at Page ID # 368.) Third, Dr. Wagshul opined that Niswonger could not perform any occupation but, as the district court noted, that opinion was not specific to Niswonger but based on general observations about persons suffering Niswonger's afflictions. (R. 23, Page ID # 2125–2126.)

Unlike the majority, I believe Dr. Brown sufficiently explained the reasons for his disagreement with Dr. Wagshul. Dr. Brown explained that the pulmonary function tests—Dr. Shah's in 2008, Dr. Sood's in 2010, Dr. Wagshul's in 2012—"produced variable and inconsistent results." (R. 12, PageID # 78.) The tests showed a steady increase in "total lung capacity" (from 51% to 61% to 89%) toward normal limits, while also showing a steady decrease in "forced expiratory volume" (from 70% to 56% to 32%) away from normal limits. The

inconsistency of these results suggested to Dr. Brown that the data was "not useful" and that any diagnoses from the data would be suspect. (*Id.*)

The Supreme Court has made clear that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Dr. Brown pointed to the inconsistency of the available pulmonary data and, in doing so, was crediting data that conflicted with Dr. Wager's. Nevertheless, the majority deems Dr. Brown's explanation to be lacking and treats Dr. Wager as being in diagnostic lockstep with Niswonger's other treating pulmonologist, Dr. Sood. *See* Maj. Op. at 8. The issue, however, is not whether Niswonger had a pulmonary condition—on that point Dr. Sood and Dr. Wagshul agreed. The issue is whether that condition rendered Niswonger unable to perform the material and substantial duties of any occupation. On this point Dr. Sood's and Dr. Wagshul's opinions diverged, both as to the cause of the breathing problems and the severity of the condition.

Dr. Sood diagnosed Niswonger with obstructive lung disease but, unlike Dr. Wagshul, did not think the disease explained the breathing problems inhibiting Niswonger's work. Dr. Sood wrote that Niswonger's pulmonary function tests "show[ed] obstructive physiology *but did not explain the degree of dyspnea that he complains about* and his cardiac echocardiogram was essentially normal." (R. 12, PageID # 415 (emphasis added).) Dr. Sood also wrote, "[Niswonger's] test results were discussed with the patient and his wife. I suspect that most of these are related to *a combination of things*; his recent weight gain, his anxiety, and he does have obstructive lung disease." (*Id.* (emphasis added)).

It was not arbitrary and capricious for Liberty to consider the totality of the evidence and decide that Dr. Wagshul's preliminary diagnosis, inconclusive data, and generalized opinions

were insufficient proof of a disability rendering Niswonger unable to perform the material and substantial duties of any occupation. Liberty's decision was especially reasonable given the inconsistency of the pulmonary function data, Dr. Sood's finding that obstructive lung disease did not explain the severity of Niswonger's breathing difficulty, and Dr. Brown's independent review of the data in which he found the data inconclusive. Niswonger disagrees with how Liberty chose to weigh the evidence, but that does not mean Liberty weighed the evidence arbitrarily or capriciously. Because the administrative record is not devoid of support for Liberty's position, and because there is a reasoned explanation for Liberty's decision based on the record, I respectfully dissent.